THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN W. JOHNSON, Defendant-Appellant.

Second District    No. 2—03—1015

Opinion filed October 19, 2005.—Rehearing denied November 17, 2005.

G. Joseph Weller and Barbara R. Paschen, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Constance Augsburger, of Buzard & Augsburger, of Mt. Morris, for the People.

JUSTICE McLAREN delivered the opinion of the court:

Defendant, John W. Johnson, appeals from his conviction of a single count of possession of less than 15 grams of cocaine (720 ILCS 570/402(c) (West 2002)). He contends that flaws in the chain of custody of two small plastic bags he possessed made it error to admit the results of tests that indicated that the substance in the bags was cocaine. He further contends that the same flaws made the evidence that the substance was cocaine so unsatisfactory as to preclude a finding of guilt beyond a reasonable doubt. We agree with defendant that the foundation presented by the State was less than optimal. However, we find that these deviations from the ideal do not create significant doubt about whether the substance defendant possessed was the same substance that was tested. Thus, a reasonable jury could have found that the State proved beyond a reasonable doubt that the substance in defendant's possession was cocaine. We also hold that defendant's objections were not such that the trial court abused its discretion in admitting the test results. Therefore, we affirm defendant's conviction. Finally, defendant asserts that the mittimus incorrectly stated that defendant was convicted on a plea of guilty, rather than on a jury verdict. The State confesses error on this point and we thus affirm the judgment as modified.

Defendant was indicted on one count of possession of less than 15 grams of cocaine. He had a jury trial that started on July 15, 2003. That the contents of the two small plastic bags tested positive for cocaine was critical evidence at the trial. We describe the evidence of the history of each bag separately.

Officer John Fong of the Waukegan police testified that, at about 1 a.m. on February 1, 2003, he was off duty and working as a security officer at the Paragon Restaurant. He and another off-duty officer approached a car in the parking lot and saw two men in the front seat. Fong saw the person in the driver's seat (defendant's brother, James) bend down as he approached. He saw defendant in the passenger seat, holding what looked like a liquor bottle. Fong spoke to the car's occupants and then took the bottle from defendant. He observed that the bottle had liquor in it. Therefore, he ordered the occupants out of the car and searched it. Under the driver's side floor mat, he found "a small plastic bagg[ie] of some white rock-like substance."

The State showed Fong People's Exhibit One. He testified that he recognized the contents of the evidence envelope as what he found under the mat because "[i]t is a rock-like substance" and "[t]his is the type of plastic bagg[ie] that was knotted [around the substance]." However, the contents of Exhibit One differed from what he found because the substance "wasn't broken up like this" and "[i]t was knotted in a plastic bagg[ie]."

Fong testified that he put the bag he found into his pocket and kept it there until Waukegan police officer Cory Kelly, the evidence technician, arrived at the restaurant. He gave the bag directly to Kelly.

Kelly testified that she put the bag in the center console of her squad car and drove, alone in the car, to the station. She took the bag from the car to the station's evidence lab, where she opened it, weighed the contents, and performed a preliminary test. Next, she put the bag and contents in a small envelope, sealed it, and placed it in a larger envelope. She sealed the larger envelope and marked it with her initials. She entered case information into a computer to generate a sticker that she placed on the outer envelope. Information on the sticker included the name of the officer from whom she received the item (Fong), and the names of the suspects (defendant and James Johnson). She agreed that she had "marked" the envelope with the date of receipt, February 1, 2003, and with a police department case number, which she gave as 03—5465.

After she labeled the envelope, she placed it in a secured evidence drop box. Based on her knowledge of the department's procedure, she testified that an evidence officer would then take the envelope to the evidence room from the drop box. Only the evidence officers had access to the evidence room, which was under video surveillance. They would store the bag in the evidence room until an evidence officer took it to the crime lab.

Kelly testified that she recognized the inner and outer envelopes and their contents. She noted that the exhibit's condition had changed in that the envelopes had additional markings, which she identified as the kind made by the crime lab, and that the small bag taken from defendant was now inside a larger plastic bag.

Elizabeth Andreasik testified that she was a forensic scientist at the Northern Illinois Police Crime Laboratory. She identified Exhibit One because it had her initials on the outside envelope.

Andreasik explained that the standard procedure at the lab was for police departments to deliver evidence to the lab by hand. Any of the approximately 11 lab employees might accept evidence; that person would place the delivery in a locked evidence room. She did not know who specifically accepted the evidence in this case from the Waukegan police.

Andreasik stated that she tested Exhibit One on March 5, 2003. Her first step was to check that the seal on the envelope was intact, which it was. Next, she confirmed that the information on the outer envelope matched the submission sheet from the police department. She noted that Exhibit One had police department case number "035645—01" on the outside. (Compare this with the number given by Kelly, 03—5465.)

The outer envelope of Exhibit One is a part of the appellate record. It bears a sticker apparently made by a laser printer, with a case number of 03—5645:01. Its appearance is otherwise consistent with the testimony of both Kelly and Andreasik.

After Andreasik made her preliminary check, she opened the outside envelope from the bottom. Inside was an unmarked smaller envelope, sealed with evidence tape, which contained a clear plastic bag with a rock-like substance inside. She took the substance out of the original bag, then weighed and tested it. That done, she placed the substance and the original bag inside another plastic bag and heat-sealed it. She placed the sealed bag back inside the evidence envelopes, sealing each with evidence tape and initialing and dating each across the seal. Andreasik recognized Exhibit One from the markings she. had made on it. She testified that the contents of the bag in Exhibit One weighed 0.67 grams and contained cocaine.

Defense counsel objected to the admission of the exhibit (and, by implication, to the admission of the test results) on the bases that (1) the State did not adequately explain how the police preserved the evidence from February 1, 2003, when Kelly placed the evidence in the drop box, until March 5, 2003, when Andreasik began the testing; and that (2) the police officers did not mark the inner envelope. The discrepancy in the testimony regarding the case number went unnoted, although defense counsel did point out that Kelly had not testified to the "01" ending to the number. The court overruled the objection.

The police found the second bag shortly after they found the first. After Fong found the first bag under the floor mat, he continued his search of the car. He found two jackets in the backseat and asked defendant and his brother to whom they belonged. Defendant's brother claimed one, so Fong draped it over his shoulders. Defendant denied ownership of the other jacket when Fong first asked. Later, however, he asked for the jacket for warmth. Fong searched it "for any weapons" and found a bundle of money, which defendant claimed. Fong placed the money in defendant's pants pocket and draped the jacket over defendant's shoulders. The transport officer, Santiago Lopez, arrived, and defendant and his brother were placed in the

squad car. Fong took the jacket off defendant and placed it in the front of the squad car, but left in place the jacket that defendant's brother had on his shoulders.

Lopez testified that he was the officer assigned to take defendant and his brother to the station. He arrived at the restaurant and found defendant and his brother in Fong's custody. Defendant's brother was handcuffed; defendant was not. Fong placed defendant and his brother in Lopez's squad car and placed the jacket defendant had been wearing on the front seat. Lopez took the two to the station. Once there, he searched the jacket defendant had been wearing and found in a side pocket a small plastic bag containing a rock-like substance. The State showed him People's Exhibit Three. Lopez identified it as containing the bag he found, although he did not specify the features by which he recognized it; he noted only the presence of a "clear plastic bagg[ie]." He further noted that the substance was no longer in the small plastic bag and that both the substance and the small plastic bag were now in a larger plastic bag.

Lopez's search of the jacket took place on a table in the booking room. When he found the bag, he took a small envelope from a slot in the table and placed the bag in it. He testified that he had the envelope in his continuous custody until Kelly took it; he thought that it was about 10 minutes until Kelly arrived.

Officer Michael Newman of the Waukegan police testified that, early in the morning of February 1, 2003, he was in the station's booking room with a prisoner. He noted the presence of Lopez, who was also with a prisoner. Newman saw Lopez empty the pockets of a jacket, finding a small plastic bag with a white substance in it. Lopez put the bag in an envelope and placed the envelope on a table. Under further direct examination, Newman revised this testimony, stating that he did not see Lopez put the plastic bag in the envelope, but only saw the envelope on the table. Newman testified that Lopez then asked him to make sure Kelly got the envelope. Kelly arrived in the booking room shortly after that. Newman told her the bag was for her, picked up the envelope, and gave it to her. Newman testified that he had the envelope in view the whole time it was on the table. Cross-examination of Newman focused on whether proper procedure would have required Lopez to initial the envelope.

Kelly testified that, after she processed the baggie that Fong gave her, the dispatcher called her back to the station. She went to the booking room and "met with Officer Newman." Asked if anyone else was present, she said that she "d[id]n't know the other officer," but she "remember[ed] seeing Officer Lopez." Newman handed her the envelope and told her that it "also [went] with the case." The State

asked her if anyone had given her the name of the case; she responded that the name was on a "piece of paper" that Newman had handed her with the envelope. She explained that the paper was a photocopy of a booking card and that she never took it out of the booking room, but handed it back to Newman.

The envelope Newman gave her was unsealed when she received it. She agreed that she had "follow[ed] the same procedures" as with the bag in Exhibit One. The label she placed on the large outside envelope differed from that on Exhibit One in that it showed a later time of collection and that she had received the evidence from Newman. She again stated that the case number on the envelope was 03—5465.

Andreasik testified to having followed the same procedures with the evidence in Exhibit Three as with the evidence in Exhibit One. She noted the case number "035645—02" on the envelope. Our examination of Exhibit Three confirms that it bears the case number 03—5645:02. Andreasik testified that the contents of the bag in Exhibit Three weighed 0.29 grams and contained cocaine.

Defense counsel objected to the admission of Exhibit Three and the associated test results on the same bases as he objected to the admission of Exhibit One. (The court heard argument on both objections at the same time.) He also argued that the police did not use adequate protective measures with Exhibit Three because Lopez had allowed the inner envelope to sit unprotected on a booking room table. Defendant contended that this failure led to significant doubt that Exhibit Three contained the same bag that Lopez took from the jacket pocket. The court overruled defendant's objection to the admission of Exhibit Three.

The jury found defendant guilty. Nothing in the verdict form shows whether the jury based its verdict on defendant's possession of Exhibit One or Exhibit Three or both. Defendant moved for a judgment notwithstanding the verdict or a new trial, arguing, *inter alia*, that the verdict was unsupported by the evidence and repeating his contention that the chain of custody of the bags was inadequate. The court denied the motion, and defendant now appeals, raising essentially the same issues. Defendant argues that the gaps in the chain are such that the State has failed to sufficiently prove one element of the offense, the presence of cocaine. He further contests the adequacy of the foundation for the admission of the test results.

The issues of whether the State provided an adequate foundation for the admission of the test results and whether adequate evidence existed for the jury to properly find that the substance defendant possessed was cocaine are separate, albeit related, issues. A foundation

can be formally insufficient, yet not necessarily create reasonable doubt.

■ To convict a defendant of unlawful possession of a controlled substance, the State must prove that he or she (1) knew of the presence of the controlled substance and (2) had immediate and exclusive possession or control of it. *People v. Woods*, 214 Ill. 2d 455, 466 (2005). A fundamental part of the proof of the first element is a showing that the substance on which the charge is based is in fact a controlled substance. The State, of course, usually does this by introducing the results of chemical testing of the substance. The rules of evidence require that, before the State can introduce such test results, it must provide a foundation for their admission by showing "that the police took reasonable protective measures to ensure that the substance recovered from the defendant was the same substance tested by the forensic chemist." *Woods*, 214 Ill. 2d at 467. That showing takes the form of evidence of a chain of custody for the substance—from the time the police seized it to the time the lab tested it. *Woods*, 214 Ill. 2d at 467.

■ A flaw in a chain-of-custody foundation does not necessarily lead to reasonable doubt about the identity of the substance tested. Two sorts of flaws are possible. One, the State may fail to build a sufficiently detailed chain-of-custody foundation, such that it is not clear whether the authorities used adequate protective measures. Two, the foundational evidence may show problems with the protective measures actually used. In either instance, the flaw may create circumstances such that one may reasonably speculate that something happened to compromise the integrity of the evidence. However, absent positive evidence of a compromising event, such an event's existence is nothing more than a reasonable hypothesis. The mere existence of a reasonable hypothesis consistent with a defendant's innocence is not enough to necessarily create a reasonable doubt of his or her guilt. *People v. Evans*, 209 Ill. 2d 194, 212 (2004). Thus, to create an issue of reasonable doubt, a flaw in a foundation based on chain of custody must do more than provide an opportunity for speculation about events in which the integrity of the evidence could possibly have been compromised. Defendant here has not provided even a reasonable hypothesis consistent with his innocence, let alone actual evidence that the evidence was compromised; he has therefore not given us that "something more" that would mandate a reversal.

The supreme court's decision in *Woods* supports this analysis. The court noted that most chain-of-custody issues are merely technical challenges to the adequacy of the foundation for the admission of the evidence. *Woods*, 214 Ill. 2d at 471-72. However, the court recognized

that certain kinds of problems revealed by the State's attempt to build a chain-of-custody foundation, such as a discrepancy in the inventory number of an item as it passes through the chain, can raise issues of whether the State has met its burden of proof. *Woods*, 214 Ill. 2d at 471-72.

■ Here, the circumstances of the bags' handling do not prevent the State from having proved defendant's guilt beyond a reasonable doubt, because they raise no significant possibility that any event compromised their integrity. When a defendant challenges the sufficiency of the evidence, the reviewing court must decide " 'whether, after viewing the evidence in the light most favorable to the prosecu-. tion, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). We give great deference to the trier of fact's determination of witnesses' credibility and of the weight to be given to their testimony. *Collins*, 106 Ill. 2d at 261-62. Crediting as we must the testimony of the officers who handled the evidence, we think it is clear that, although they might easily improve their procedures to reduce the risk of confusion between pieces of evidence, no such confusion occurred. We are concerned that the department's apparent practice of leaving drug evidence unlabeled until it reaches the evidence technician creates, among other things, unnecessary risks of interchange between similar-looking pieces of evidence. However, the officers' testimony does not suggest any point in the handling of *this particular* evidence where a plausible source for substitution existed.

Specifically as to Exhibit Three, we acknowledge that the bag was vulnerable when Lopez left it with uncertain supervision, in an unsealed envelope, and on a table in a busy room. However, crediting Newman's testimony that he paid attention to it at all times, no one had the opportunity to meddle with the bag.

Defendant contends that Lopez's testimony was incredible because he testified that he had the bag from the jacket pocket in his continuous custody from the time he found it until the time Kelly took it, whereas Newman and Kelly agreed that Kelly received the bag from Newman. Lopez's testimony is puzzling, but it casts no doubt on Newman's assertion that *he* could watch the envelope at all times.

Further, as to both exhibits, we find no basis for reasonable doubt in the lack of police markings on the inner envelopes. That the police labeled only the outer envelopes was a result of the evidence not being labeled at all until Kelly was about to place it in the drop box. We have explained why the late labeling was undesirable, but not necessarily a

source of reasonable doubt. That Kelly placed the bag from the car in an inner envelope immediately before placing it in the labeled envelope added no risk of confusion—it simply meant that two sealed envelopes protected the bag. That Lopez placed the bag from the jacket in a small envelope before placing it on the table may have created some risk that someone could interchange it with some other unlabeled envelope. However, the history of the bag gives no suggestion that that actually happened.

Defendant also argues that the State's failure to account for the bags from when Kelly put them into the evidence drop box until Andreasik tested them creates doubt about the link between the test results and the bags. However, the absence of direct testimony regarding the handling of the bags is not a source of reasonable doubt of defendant's guilt. Kelly testified that the department's procedure was for an evidence officer to take evidence from the drop box to the secured evidence room and keep it there until an evidence officer personally delivered it to the lab. Nothing suggests that anything went wrong with this procedure, and nothing suggests that the bags were ever missing. Kelly placed both bags in sealed and initialed envelopes; Andreasik received them in similarly sealed and initialed envelopes. The jury was not required to imagine ways in which the evidence's integrity could have been compromised in this period simply because the State did not absolutely rule out the possibility. See *Evans*, 209 Ill. 2d at 212.

In *Woods*, the supreme court suggested that the discrepancy between the inventory number of the item recovered and the item tested could signify "a complete breakdown in the chain of custody" (*Woods*, 214 Ill. 2d at 471) and therefore amount to plain error. *Woods*, 214 Ill. 2d at 471-72. Thus, although defendant does not raise the point, we consider the effect of Kelly and Andreasik having given different case numbers to identify the evidence. Kelly testified twice that the case number she placed on the evidence envelopes was "03—5465," whereas Andreasik testified that the envelopes she tested bore the case numbers "035645—01" and "035645—02." Initially, the record did not contain the evidence envelopes, and we could not wholly rule out the possibility that the results to which Andreasik testified were from the wrong case. However, we ordered defendant to supplement the record with the evidence envelopes. We observe that, although the envelopes in every other respect matched Kelly's description, including the identification of defendant and his brother as the suspects, Exhibit One bears a case number of 03—5645:01 and Exhibit Three bears a case number of 03—5645:02. These numbers correspond to Andreasik's testimony. This convinces us that the jury could find

the discrepancy was merely the result of a mental slip by Kelly when she testified. The jury was thus entitled to conclude that the chain of custody was intact and that no significant chance existed that Andreasik testified to test results from the wrong evidence.

■ We now turn to the issue of the trial court's application of the rules of evidence in admitting Exhibits One and Three and their associated test results. We conclude that the trial court did not improperly apply the rules of evidence. When the State seeks to have the court admit results of the chemical testing of seized substances, the court must decide whether "reasonable measures were employed to protect the evidence from the time that it was seized and that it was unlikely that the evidence has been altered." *Woods*, 214 Ill. 2d at 467.[1] It must determine whether the State has met its "burden to establish a custody chain that is sufficiently complete to make it improbable that the evidence has been subject to tampering or accidental substitution." *Woods*, 214 Ill. 2d at 467.

> "Unless the defendant produces evidence of actual tampering, substitution or contamination, a sufficiently complete chain of custody does not require that every person in the chain testify, nor must the State exclude every possibility of tampering or contamination; the State must demonstrate, however, that reasonable measures were employed to protect the evidence from the time that it was seized and that it was unlikely that the evidence has been altered." *Woods*, 214 Ill. 2d at 467.

The court may properly admit evidence, despite a lack of testimony from every person participating in the chain of custody, if the State can show that the condition of the evidence did not change while it was in the hands of the nontestifying custodian. See, *e.g.*, *People v. Bynum*, 257 Ill. App. 3d 502, 510 (1994). When a defendant challenges a trial court's evidentiary ruling on appeal, the reviewing court must decide whether the trial court abused its discretion in making the ruling (*People v. Bradney*, 170 Ill. App. 3d 839, 864 (1988)), that is, whether the court's ruling was "arbitrary, fanciful[,] or unreasonable, such that no reasonable person would take the view adopted by the trial court." *People v. Engle*, 351 Ill. App. 3d 284, 288 (2004). The reviewing court's task is therefore to decide whether the trial court's application of the rules for establishing a foundation based on a chain of custody was reasonable.

---

[1] The cases mostly discuss the requirements as if the State's goal were the admission of the physical evidence. Of course, where the evidence is such that a chain of custody is a necessary foundation, the physical appearance of the piece of evidence will generally be unrevealing. As here, the actual contest is over the results of any forensic testing.

As we noted above, the handling of the bags does not raise significant concerns that their integrity was compromised. Thus, it was not an abuse of discretion for the trial court to decide that it was unlikely that the evidence had been altered. The remaining question is whether the court used its discretion properly in deciding whether the State fulfilled the more technical criteria for the admission of the evidence. Defendant points to Fong and Lopez's failure to initial the bags, the leaving of the bag from the jacket pocket on the booking room table, and the lack of testimony regarding the storage and transport of the bags to the lab, as defects that preclude the admission of the test results. Although we again agree with defendant that the police's procedures seem to have been less than optimal, we do not consider that the problems were such that the court abused its discretion in admitting the evidence.

The trial court must decide whether the police employed *reasonable* measures to protect the evidence from the time they seized it. The failure of the police to label the evidence immediately and their leaving it on the booking room table clearly were not *optimal* procedures. For example, because a small plastic bag of a white, rock-like substance is not distinctive, when an officer seizing such evidence does not mark it, it is unclear how he or she can positively identify that evidence later except by relying on the labeling done by someone else. Nevertheless, the officers never did anything with the bags to create an imminent risk of undetected substitution or tampering. Given this, although we might have decided the matter differently than the trial court, we cannot conclude that it was an abuse of discretion to deem the procedure reasonable. See *People v. Payne*, 239 Ill. App. 3d 698, 707 (1993) (although police kept drug evidence unsealed and unmarked for several days, defendant's suggestion that the evidence was compromised was pure speculation, and did not make the evidence inadmissable).

Defendant also argues that the chain-of-custody evidence was an insufficient foundation for the admission of the test results because the State put on no direct testimony regarding the keeping of the bags from the time Kelly put them in the drop box until the lab received them. We agree with cases from several divisions of the First District (*e.g.*, *People v. Bishop*, 354 Ill. App. 3d 549, 560 (2004)) regarding the evidence that can replace a missing link in a chain of custody. Those cases hold that, when no positive evidence of tampering or other contamination exists, the proponent of the evidence can replace a missing link, created when one or more custodians of the evidence do not testify, with evidence (1) that the evidence left the hands of one testifying custodian in a sealed envelope or other container and ar-

rived in the hands of the next testifying custodian still in a sealed container, and (2) that the identifying number or code on the container sent out matches that on the container received. The State satisfied the first of these criteria with Kelly's testimony that she sealed each bag first in a small envelope and then a large one and with Andreasik's testimony that she received each bag sealed in two layers of envelopes. Although defendant could have argued that the State technically failed to show consistent numbers, in light of Kelly's misstatement at trial of the case number she placed on the envelope, we cannot say that the trial court abused its discretion because defendant did not raise the matter before the trial court.

As we noted, it is well established that when no indication exists that evidence has been tampered with or its integrity otherwise compromised, the State need not present the testimony of every custodian of the evidence. *E.g.*, *Bynum*, 257 Ill. App. 3d at 510. In such cases, testimony showing that the condition of the evidence remained unchanged in the period to which no one testifies can substitute for the testimony of the custodian. *E.g.*, *Bynum*, 257 Ill. App. 3d at 510. However, a division exists as to the detail with which the witnesses must describe the evidence for the foundation to be adequate. In *People v. Cowans*, 336 Ill. App. 3d 173, 176-81 (2002), a panel of the First District, Sixth Division, held that the State had failed to provide a sufficient description of the condition of the evidence, where the officer who recovered the evidence and the forensic scientist who tested it failed to provide corresponding physical descriptions of the items seized, such as the color of the packaging and the weight of the packages. In *People v. Harris*, 352 Ill. App. 3d 63, 69 (2004), however, a First District, Fourth Division, panel held that the State had established a sufficient foundation for the admission of test results when it provided a stipulation that the forensic scientist would testify that he received a sealed package marked with the same inventory number as that placed on the package by the officer who recovered the evidence. The *Harris* court specifically rejected the holding in *Cowans* on the basis that a detailed matching description is unnecessary to establish that it was unlikely that the integrity of the evidence had been compromised. *Harris*, 352 Ill. App. 3d at 69-70. Panels in the First District, First Division, have reached similar conclusions in *People v. Foster*, 354 Ill. App. 3d 564, 569 (2004), and *Bishop*, 354 Ill. App. 3d at 560-61.

We agree with the conclusions of *Harris*, *Foster*, and *Bishop*, and reject the holding in *Cowans*. The rules of evidence do not require the State to exclude every possibility of tampering or contamination. *Woods*, 214 Ill. 2d at 467. Showing that evidence remained in official

hands and in a sealed container and was tracked under a consistent identifying number or code effectively excludes the possibility of anything but deliberate tampering. That is a reasonable level of certainty to which a physical description of the evidence adds little more.

Defendant *might* have argued that the State failed to provide the kind of foundation accepted by *Harris, Foster*, and *Bishop* because of the confusion regarding the case number. However, assuming that such an argument would have been viable, defendant waived it because he never brought the problem to the court's attention; his general objection to the sufficiency of the foundation was insufficient to preserve the issue for review. To preserve an issue of the admission of evidence for review, a defendant must make an objection specifically stating the grounds on which he or she asserts the evidence is inadmissible. *Woods*, 214 Ill. 2d at 470. That the objection be specific is of particular importance when the objection is that the State has failed to lay a proper technical foundation for the evidence's admission, because a proper objection gives the State an opportunity to correct the omission. *Woods*, 214 Ill. 2d at 470. Had defendant brought the discrepancy between Kelly's testimony, that the envelopes she prepared bore the case number "03—5465," and Andreasik's, that the envelopes she tested bore the case numbers "035645—01" and "035645—02," the State could have recalled Kelly and questioned her regarding her recollection of the case number. Presumably this would have established what is already evident from the overall circumstances, namely, that Kelly interchanged digits in the case number due to a simple mental slip during her testimony.

As a final matter, defendant contends that the mittimus in this case is incorrect because it states that he was convicted after a plea of guilty, rather than after a jury trial. The State confesses error on this point. Therefore, pursuant to Supreme Court Rule 615(b)(1) (134 Ill. 2d R. 615(b)(1)), we modify the mittimus to reflect the fact that defendant's conviction was after a trial.

For the reasons given, we affirm as modified the judgment of the circuit court of Lake County.

Affirmed as modified.

O'MALLEY, P.J., and BYRNE, J., concur.