**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 180067-U

Order filed March 24, 2022

IN THE
APPELLATE COURT OF ILLINOIS
THIRD DISTRICT
2022

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the Circuit Court |
| | ) | of the 14th Judicial Circuit, |
| Plaintiff-Appellee, | ) | Whiteside County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-18-0067 |
| | ) | Circuit No. 17-CF-76 |
| KAREEM D. HAYNES, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | William S. McNeal, |
| | ) | Judge, presiding. |

JUSTICE McDADE delivered the judgment of the court.
Justice DAUGHERITY concurred in the judgment.
Justice HOLDRIDGE specially concurred.

**ORDER**

¶ 1    *Held*: The circuit court did not err when it allowed the jury to review audio evidence in the courtroom with the court and parties present, and cumulative error was not found such that the defendant was prejudiced during trial.

¶ 2    Defendant, Kareem D. Haynes, appeals from his conviction of unlawful possession and delivery of a controlled substance. He contends that (1) the trial court committed reversible error during deliberations when it replayed audio evidence for the jury in open court; (2) the State failed to establish a sufficient foundation for the admission of forensic scientist Edward McGill's opinion that the alleged controlled substance was cocaine; (3) the State failed to establish sufficient chain of custody for the cocaine evidence; (4) the trial court erred by admitting

Detective Brad Barron's field test as reliable evidence; and (5) he was prejudiced by the cumulative effect of multiple errors pervading his trial. We affirm.

## ¶ 3                                 I.  BACKGROUND

¶ 4      On March 28, 2017, Kareem D. Haynes (Haynes) was charged with unlawful delivery of a controlled substance (720 ILCS 570/401(d) (2017)) (count I) and unlawful possession of a controlled substance (720 ILCS 570/402(c) (2017)) (count II) after he delivered a substance containing cocaine to an agent of the Sterling Police Department (SPD) during a controlled buy. On September 5, 2017, defense counsel filed a motion *in limine*, requesting the prohibition of any evidence that Haynes had a warrant for his arrest at the time of the alleged offense. The court granted the motion and advised the prosecutor to instruct his witnesses not to mention Haynes' warrants.

¶ 5      The court conducted a jury trial beginning on October 10, 2017. During opening statements, the prosecutor told the jury, *inter alia*, that a confidential informant, Alicia Brown, worked with Detective Barron and Sergeant Schmidt of the SPD to make a controlled buy of narcotics from a man Brown knew as "Johnny" (later identified as Haynes). Brown initially contacted Haynes by phone, and the two agreed that Brown would buy a quantity of crack cocaine for $150.00 and specified the location of the buy. Brown was provided $150.00 in official advance funds (OAF) and proceeded to the specified location (a trailer) to purchase the cocaine with a digital recording device on her person. An unknown female met Brown when she entered the trailer. Moments later, Haynes arrived, accepted Brown's $150.00, and provided her a quantity of crack cocaine. Barron then met Brown at a specified location, debriefed her, weighed the substance, and conducted a field test.

¶ 6    The State further asserted that after the controlled buy, members of the Illinois State Police Blackhawk Area Narcotics Task Force followed Haynes in his vehicle. He was eventually stopped and arrested. Upon his arrest, Haynes was found to have the $150.00 in OAF on his person and he was charged.

¶ 7    At Haynes' trial, Brown testified that Detective Barron informed her during a conversation at the SPD that she was the target of a drug investigation. During that discussion, she agreed to provide Barron with the identity of persons she felt he would want to investigate, including "Johnny." After deciding to participate in a controlled buy from Haynes, Brown contacted Haynes by phone. During that conversation, Haynes specified the trailer as the location for her to buy the crack cocaine and told her to "make it quick" because he was "getting ready to go to the city to re-up." Brown testified that by "re-up," she assumed that Haynes intended to "get more drugs." Brown explained that upon walking into the trailer to perform the controlled buy, a woman she knew as "Tiffany" (later identified as Latavia) greeted her. Brown had seen Latavia around the neighborhood before but "didn't really know her."

¶ 8    Regarding the controlled buy, Brown stated that a bag of crack was lying on a counter in the trailer, and she believed that Latavia was going to hand it to her. However, before Latavia conducted the sale, Haynes walked into the trailer and made a deal with Brown. Brown estimated that from the time she stepped inside the trailer to the time Haynes arrived and made the deal, a matter of forty-five seconds had passed. Brown explained that the bag containing narcotics that Haynes handed her was frayed, prompting her to ask for and receive another bag, which she placed around the first.

¶ 9    Barron confirmed that Brown was the target of a prior investigation for possessing and selling crack cocaine, but she had not yet been charged. In late November 2016, Barron allowed

3

Brown to participate as a confidential informant in pursuing "a bigger target," Haynes. Barron and additional officers, including the task force, conducted surveillance during the controlled buy. Brown then met Barron at a specified location and provided him with the bag of narcotics she purchased and the digital recorder she discreetly wore during the controlled buy.

¶ 10    At that time, Barron also conducted a recorded debriefing of Brown. That recording was admitted as evidence and played for the jury during trial. During the debriefing, Brown confirmed that Barron gave her $150.00 in OAF and a digital recording device. Afterward, she arranged a controlled buy with Haynes, who requested that she meet him at a specified trailer. When she arrived at the location, she met a woman (later identified as Latavia) who Brown, at the time, purported to have never seen before.[1] The woman stated, "This is all that's left, you might be a little short." Brown indicated that that was fine, and she asked Latavia for what was left. At that time, Haynes entered the trailer, Brown handed him the money, and he gave her the alleged cocaine. Brown specified that the woman in the trailer did not pass her the cocaine. Brown believed the woman was going to do so before Haynes came in and "proceeded to take care of business."

¶ 11    Barron then testified that he performed a field test using a Sirchie NARK swipe to "confirm" the presence of crack cocaine. Over an objection from the defense, Barron asserted that the test was positive for the presence of crack cocaine. Photos were admitted and published to the jury, over objection, showing the bag of alleged crack cocaine containing a white substance and weighing 1.1 grams with packaging. Barron described to the jury the process by

---

[1] During trial, Brown testified that she *did* know Latavia as "Tiffany," but she failed to recognize her during the controlled buy, did not know her last name, and had not seen her for several months to a year. Brown explained that Tiffany had changed her appearance since the last time she saw her, causing the confusion.

which he handled the evidence. The bagged evidence was placed into a larger evidence bag, sealed, and put into a temporary storage locker at the SPD. Next, Barron completed a submission form and transferred the evidence to a secured evidence locker. An evidence custodian then sent the evidence to the Illinois State Police Crime Lab, where it was tested by Edward McGill, a forensic scientist.

¶ 12 McGill testified that he received the evidence by mail and recorded it on a laboratory receipt, which is used to document the chain of evidence. McGill explained that when he received the evidence, it was in a sealed bag which contained one clear plastic bag with a white rocklike substance inside. The substance, without the packaging, weighed three-tenths of a gram. McGill provided a detailed explanation of how he tested the chemical and determined that it was, in fact, cocaine.

¶ 13 All individuals who handled the evidence testified that proper procedures were followed, and a detailed chain of custody was recorded. Defense counsel objected to the admission of People's Exhibit 6—a sealed SPD evidence bag with a smaller sealed plastic bag inside containing cocaine—claiming that an unexplained irregularity compromised the chain of custody. Specifically, counsel asserted that when McGill received the substance, it was in one small bag, but Barron testified that the substance was in two small bags when he received it and put it into the larger evidence bag. The court admitted the exhibit over defense counsel's objection.

¶ 14 During closing arguments, the State urged the jury to remember that Brown testified that she gave Haynes $150.00 in OAFs. Defense counsel argued that Brown had lied about her interaction with Haynes to protect Latavia. Defense counsel also argued that the overhear recording established that the buy was complete between Latavia and Brown before Haynes

entered the trailer. The defense emphasized the chain-of-custody issue regarding the discrepancy in small bags, arguing that it was unknown if the substance at trial was the same substance that Brown had provided to Barron. In rebuttal, the State argued that the defense was throwing up a "smokescreen." The State also claimed that Haynes' job was to sell drugs and that the jury had not been told anything else regarding his job.

¶ 15    During jury deliberations, the jury sent the court two notes: one asking to listen to the overhear recording again and the second asking to listen to Barron's debriefing of Brown. The court brought the jury into the courtroom two separate times to listen to each recording. The attorneys, the judge, and the court reporter remained in the courtroom. Before playing the first recording, the court told the jury not to formulate or ask any questions while in the courtroom. The jury found Haynes guilty of both unlawful possession and unlawful delivery of a controlled substance. On November 9, 2017, Haynes filed a motion for a new trial which the court denied on January 19, 2018. This timely appeal followed.

¶ 16                                    II.  ANALYSIS

¶ 17    On appeal, Haynes asserts the following: that (1) the trial court committed reversible error during deliberations when it replayed audio evidence for the jury in open court; (2) the State failed to establish a sufficient foundation for the admission of McGill's opinion that the alleged controlled substance was cocaine; (3) the State failed to establish a sufficient chain of custody for the cocaine evidence; (4) the trial court erred by admitting Barron's field test as reliable evidence; and (5) that he was prejudiced by cumulative error created by the State.

¶ 18                                  A. Audio Evidence

¶ 19    Haynes claims that the trial court abused its discretion and committed reversible error when, after the jury asked to have audio evidence replayed during deliberations, the court

replayed the evidence in the courtroom, which "chilled the deliberations and prevented jurors from speaking and acting freely." That argument has now been foreclosed by our supreme court's holding in *People v. Hollahan*, 2020 IL 125091.

¶ 20 "It is well-established that whether evidentiary items * * * should be taken to the jury room rests within the discretion of the trial judge, whose decision will not be disturbed unless there was an abuse of discretion to the prejudice of the defendant." *Hollahan*, 2020 IL 125091, ¶ 11 (citing *People v. Hudson*, 157 Ill. 2d 401, 439 (1993)). "Moreover, the trial court has the discretion to grant or deny the jury's request to review evidence." *Hollahan*, 2020 IL 125091, ¶ 11 (citing *People v. Kliner*, 185 Ill. 2d 81, 163 (1998)). A trial court's rulings on such matters are reviewed for an abuse of discretion. *People v. McKinley*, 2017 IL App (3d) 140752, ¶ 22.

¶ 21 In *Hollahan*, a man was charged with driving under the influence, and a video recording of the traffic stop was admitted into evidence and played for the jury. 2020 IL 125091, ¶ 4. During jury deliberations, the jury asked to watch the video of the defendant's traffic stop again. *Id.* The trial court granted that request and, due to a lack of technical capabilities in the jury room, the jury was returned to the courtroom to watch the video evidence. *Id.* The trial judge warned the jury not to have any conversations while outside the designated room for jury deliberations. *Id.* The defendant, the attorneys, and two alternate jurors remained in the courtroom while the jury watched the defendant's traffic stop video. After viewing the video evidence, the jury returned to the jury room for continued deliberations. *Id.* Less than an hour later, the jury rendered a guilty verdict. *Id.* On appeal, the defendant claimed, and the appellate court agreed, that second-prong plain error necessitated a new trial due to the trial court's decision to allow the jury to watch the video evidence outside of the jury room in open court. *Id.* at ¶ 4.

7

¶ 22

The Illinois Supreme Court reversed the appellate court's holding, rejecting "the notion that deliberations, once begun, cannot be suspended by the trial court" and citing Illinois Supreme Court Rule 436 (eff. July 1, 1997). Supreme Court Rule 436 states as follows:

> "(a) In criminal cases, either before or *after submission of the cause* to the jury for determination, the trial court may, in its discretion, keep the jury together in the charge of an officer of the court, or the court may allow the jurors to separate temporarily outside the presence of a court officer, overnight, on weekends, on holidays, or in emergencies. (b) The jurors shall, whether permitted to separate or kept in charge of officers, be admonished by the trial court that it is their duty (1) not to converse with anyone else on any subject connected with the trial until they are discharged; (2) not to knowingly read or listen to outside comments or news accounts of the procedure until they are discharged; (3) not to discuss among themselves any subject connected with the trial, or form or express any opinion on the cause until it is submitted to them for deliberation; and (4) not to view the place where the offense was allegedly committed." (Emphasis added.)

¶ 23

In adherence to Supreme Court Rule 436, "[c]learly, a court may, after submission of the case to the jury, suspend deliberations and bring the jury back into the courtroom for supplemental instruction, when warranted, or even allow the jurors to separate temporarily outside the presence of a court officer with proper admonishments." *Hollahan*, 2020 IL 125091, ¶ 25. Moreover, the supreme court found that the defendant failed to demonstrate any demonstrable prejudice by the presence of additional individuals in open court while the video evidence was played or by the suspension of jury deliberations. *Id.* ("We believe it is appropriate,

8

in this context, to make clear that "jury deliberation" is not some uncontrollable chain reaction—as defendant would have it—that, once set in motion, is beyond the power of the trial court to suspend, control, and circumscribe as the court reasonably sees fit in the exercise of its discretion. Moreover, "jury deliberation" is a *collective* process that necessarily entails communicative interchange amongst the members of the jury.").

¶ 24　　　　In this case, as in *Hollahan*, Haynes has not made any specific allegation of undue prejudice, nor, in light of *Hollahan*, does this court find that he was prejudiced by the temporary suspension of jury deliberations or the presence of the attorneys, judge, and the court reporter in the courtroom as the jury listened to the audio evidence. Accordingly, we find no error.

¶ 25　　　　　　　　　　　　　　　　B. Foundation

¶ 26　　　　Haynes asserts that the State failed to establish a sufficient foundation for the admission of McGill's forensic opinion that the alleged controlled substance was cocaine. See *People v. Bynum*, 257 Ill. App. 3d 502, 514 (1994) ("[W]hen expert testimony is based upon an electronic or mechanical device * * * the expert must offer some foundation proof as to the method of recording the information and proof that the device was functioning properly at the time it was used."). Specifically, by way of McGill's testimony, Haynes contends the State did not provide evidence that the gas chromatography mass spectrometer (GCMS) was working correctly at the time of McGill's testing of People's Exhibit 6.

¶ 27　　　　During the trial, Haynes did not object to McGill's testimony regarding his use of the GCMS machine, nor did he object to McGill's scientific opinion based on that testing. Haynes also did not raise the issue in his post-trial motion. See *People v. Enoch,* 122 Ill. 2d 176, 186 (1988) (explaining that both a trial objection and a written posttrial motion raising the issue are necessary to preserve an issue for review). Consequently, Haynes has forfeited the issue.

9

¶ 28    We may review forfeited errors where (1) the evidence "is so closely balanced that the jury's guilty verdict may have resulted from the error" or "the error is so serious that the defendant was denied a substantial right." *People v. Herron*, 215 Ill. 2d 167, 178–79 (2005). The State argues that we may not review this error under the plain-error doctrine under Supreme Court Rule 341(h)(7) because Haynes did not argue plain error in his opening brief. We disagree. Haynes "has argued plain error in his reply brief, which is sufficient to allow us to review the issue for plain error." *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010).

¶ 29    However, Haynes is unable to meet his burden of persuasion under the plain-error doctrine of establishing that the error was prejudicial. Haynes does not argue that the error is cognizable under the second prong of the doctrine, choosing instead to respond to the State's argument under the first prong. Under the first prong, an error is prejudicial if "it occurred in a close case where its impact on the result was potentially dispositive." *People v. Sebby*, 2017 IL 119445, ¶ 68. We see nothing on this record allowing us to reach that conclusion. The evidence presented at trial was not closely balanced. *Id.* at ¶ 69 ("The only question in a first-prong case, ***, is whether the evidence is closely balanced."). The evidence here established that Brown contacted Haynes as part of controlled buy and agreed to buy crack cocaine from him. Haynes specified the trailer as the meeting location and told her to "make it quick" because he was "getting ready to go to the city to re-up." Brown testified that by "re-up," she assumed that Haynes meant he intended to "get more drugs." Moreover, McGill testified that the result of his forensic testing definitively identified the substance in question as crack cocaine. Haynes has pointed to no evidence from which we could discern an opposing version of events or that would contradict the version presented in the State's evidence.

¶ 30                                                    C.  Chain of Custody

¶ 31        Haynes also argues that his conviction should be reversed and remanded due to the State's failure to establish a sufficient chain of custody for People's Exhibit 6. In his brief to the court, Haynes highlights a discrepancy between the testimonies of Brown, Barron, and McGill as it pertains to the number of bags used to hold the crack cocaine evidence. Specifically, Brown testified that the cocaine she received from Haynes during the controlled buy was given to her in a frayed bag, prompting her to place another bag around the original frayed bag. Barron then testified that Brown gave him a clear plastic bag containing what appeared to be crack cocaine. He asserted that the bag was tied shut and, when he opened the bag to conduct the field test, there was a second bag inside which contained the actual substance. That bag appeared to have a small rip or opening. However, in contrast to the testimony of Brown and Barron, McGill testified that when he received People's Exhibit 6, the alleged crack cocaine evidence was in a sealed evidence bag which contained *one* small plastic bag with a white rock-like substance inside.

¶ 32        McGill testified in detail before the court regarding how he received the evidence, tested and weighed the evidence, and resealed the evidence. McGill was specifically questioned regarding the defense's theory that the evidence had been tampered with, causing the ripped bag that had previously been present with the evidence to disappear. When asked by the defense if he recalled receiving more than one evidence bag from the SPD, McGill responded, "Not that I recall, no." McGill also indicated that he could not tell, by looking at People's Exhibit 6 in the courtroom, how many little bags were currently present.

> "Q. MR. DOHERTY [(ASSISTANT STATE'S ATTORNEY)]: Uhm, Mr.
> McGill, in reference to People's Exhibit Number 6, the inner bags, as his

Honor had pointed out, was something that was submitted from [SPD], can you tell how many numbers of bags are in there at that point?

A. MR. MCGILL: I can tell that there is a plastic bag in there. I can't tell if it is more than one bag, no."

¶ 33 Based on this discrepancy—whether or not a ripped or frayed miniature bag was present inside the sealed SPD evidence bag—the defense claims "that the evidence [Barron] received from Brown and packaged for lab testing was either (1) accessed and tampered with before McGill accessed it at the lab or (2) substituted for the evidence that McGill ultimately received and tested." Haynes also contends that the difference in weight between the substance weighed alone (0.3 grams) and the substance weighed while inside the small bag (1.1 grams) is a "red flag." Haynes finds this discrepancy implausible.

¶ 34 Barron testified in detail regarding how he handled the cocaine evidence. After the field test, Barron placed the purported crack cocaine, along with both bags, into a larger evidence bag, sealed the evidence bag and placed it in a designated temporary storage locker at the police department to be accessed by the evidence vault manager, Frankfother. Barron then submitted a form requesting that it be sent to the crime lab for testing. Frankfother also provided detailed testimony regarding her handling of the evidence, testifying that she retrieved the evidence from the temporary evidence locker and placed it into the secured evidence vault where items that were to be sent to the lab were kept. She and the SPD administration have access to the secured vault. She then sent the evidence to the lab by certified mail.

¶ 35 The trial court's determination of whether a party has presented a sufficient chain of custody for the admission of evidence or has laid an adequate foundation for an expert's testimony are issues reviewed for an abuse of discretion. *People v. Simmons*, 2016 IL App (1st)

12

131300, ¶109; *People v. Britton*, 2012 IL App (1st) 102322, ¶17. The State bears the burden to establish a chain of custody that is sufficiently complete to make it improbable that the evidence has been subject to tampering or accidental substitution. *People v. Woods*, 214 Ill. 2d 455, 467 (2005). The State must show the police took "reasonable protective measures to ensure that the substance recovered from the defendant was the same substance tested by the scientist." *Id.*

¶ 36 In *People v. Johnson*, 361 Ill. App. 3d 430, 435 (2005), the defendant was charged with and convicted of a single count of possession of fewer than 15 grams of cocaine. *Johnson*, 361 Ill. App. 3d at 432. At trial, People's Exhibit 3 was a bag containing a rock-like substance that an officer found in the defendant's jacket. During the trial, Officer Lopez testified that he had found a small plastic bag in defendant's jacket and that the substance, and the small bag were, at trial, contained in a larger plastic bag. *Id.* Lopez testified that, when he found the bag, he placed it in an envelope and that he had the envelope in his continuous custody until Officer Kelly took it. *Id.* at 435. Officer Newman testified that he observed Lopez search the jacket in question, find a small plastic bag with a white substance inside, and place that bag in an envelope and set it on a table. *Id.* Newman initially testified he saw Lopez place the envelope on the table. Later, he revised his testimony, stating that he only saw Lopez place the envelope on the table; he did not see him place the small evidence bag inside the envelope. *Id.* "Newman [also] testified that Lopez then asked him to make sure Kelly got the envelope." *Id.* "Kelly arrived in the booking room shortly after that." *Id.* Similarly, Kelly testified that she met Newman in the booking room, he handed her a piece of paper with the case name written on it, and the envelope which he told her "[also] went with the case."

¶ 37 A forensic scientist, Andreasik, testified as to the procedures she followed to test the evidence in this case. As it pertained to People's Exhibit 3, Andreasik noted that the case number

"035645–02" appeared on the envelope. In contrast, Kelly testified twice that the case number she placed on the evidence envelope was "03–5465." On appeal, the defendant contended, *inter alia*, that flaws in the chain of custody of People's Exhibit 3 made it error to admit the test results indicating that the substance contained in the bag was, in fact, cocaine. *Id.*

¶ 38    The *Johnson* court opined that Lopez's testimony—that he had the evidence in his continuous custody from the time he found it in the defendant's jacket—was "puzzling"; however, it held that that "casts no doubt on Newman's assertion that *he* could watch the envelope at all times." *Id.* at 438. Moreover, the court found that, given Newman's testimony, no one had the opportunity to handle or tamper with the evidence, despite the bag's vulnerability in the position it was placed by Lopez. *Id.* Additionally, the *Johnson* court found that, while the police procedures used in that case—leaving drug evidence unlabeled until it reached the evidence technician—could be improved upon, they did not suggest a plausible source for substitution of the instant evidence. *Id.* at 439.

¶ 39    The *Johnson* court also addressed the fact that the forensic scientist, Andreasik, testified that the envelope she tested bore the case number "035645-02", while Kelly testified twice that the case number she placed on the envelope was "03-5465." *Id.* The numbers on the actual envelopes corresponded to Andreasik's testimony, which convinced the *Johnson* court "that the jury could find the discrepancy was merely the result of a mental slip by Kelly when she testified." *Id.* at 439-40. Thus, the jury could find that no significant chance existed that Andreasik testified to the results from the wrong evidence. *Id.* at 440.

¶ 40    Here, Haynes made no specific allegation that someone outside of the chain of custody had access to and tampered with People's Exhibit 6. Rather, the primary individuals who handled the evidence—Barron and McGill—testified that the item they observed in court was the same

14

item that they had handled at pertinent times in this case. The State also presented evidence that law enforcement "took *reasonable* protective measures to ensure that the substance recovered from the defendant was the same substance tested by the forensic chemist." *Woods*, 214 Ill. 2d at 467 (citing *People v. Ryan,* 129 Ill. App. 3d 915, 919 (1984)). Because Haynes has not shown actual tampering, substitution, or contamination of the substance itself, and in light of the credible testimony regarding the chain of custody presented during the trial, this court cannot find that error occurred by the trial court's admission of People's Exhibit 6 into evidence.

¶ 41                                 D. Field Test Evidence

¶ 42        Haynes also contends that the trial court erred in allowing Barron to testify that the field test was able to *confirm* the presence of crack cocaine, arguing that case law and other sources have established that field tests are only able to establish the *possible* presence of drugs in substances. See *People v. Manzo*, 2018 IL 122761, ¶¶ 6-8 (discussing field tests for cocaine as yielding presumptive results). Regardless, the question of whether Barron's testimony about the field test was accurate or proper is of minimal importance to this case, as any error committed by the trial court in permitting such testimony was harmless.

¶ 43        An error is harmless if it is inconsequential or if it appears it did not affect the trial's outcome. *People v. Blommaert*, 184 Ill. App. 3d 1065, 1075 (1989). In determining if any error is harmless, the reviewing court must determine whether it appears beyond a reasonable doubt the error at issue did not contribute to the verdict. *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). When deciding whether an error is harmless, a reviewing court may: (1) focus on the error to determine if it contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the

15

improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008).

¶ 44 Even without considering Barron's testimony on this topic, McGill testified that the result of his forensic testing definitively identified the substance in question as crack cocaine. The first test conducted by McGill, which was essentially a field test, indicated the "possible presence of cocaine." The second test conducted by McGill, the GCMS test, conclusively established the substance tested was cocaine. Thus, the jury heard McGill unequivocally testify that the substance he tested was positive for cocaine, rendering Barron's testimony on this topic essentially inconsequential.

¶ 45                                        C. Cumulative Error

¶ 46 Additionally, Haynes asserts that if this court concludes that he is not entitled to a new trial on the basis of any of the claims raised above, then this Court should reverse his conviction and remand the matter for a new trial because the cumulative effect of multiple errors deprived him of a fair trial. He argues that the following four trial events, in addition to the arguments we have already analyzed, cumulatively created error: (1) that on multiple occasions the State violated the pre-trial order that prohibited the introduction of evidence of Haynes' active warrants; (2) that the State improperly elicited prejudicial testimony from Barron regarding his prior acquaintance with Haynes; (3) that the jury heard a litany of evidence concerning $150.00 of OAFs allegedly recovered from Haynes despite the State's failure to establish a foundation for the admission of the funds into evidence; and (4) that the prosecutor made multiple improper statements during closing and rebuttal arguments.

¶ 47 Cumulative error occurs where multiple trial errors, working in concert, "created a pervasive pattern of unfair prejudice to the defendant's case." *People v. Blue*, 189 Ill. 99, 139

(2000). Our inquiry is then "[t]o determine whether the defendant's right to a fair trial has been compromised, [applying] the same test [for] the second prong of the plain error test. We ask whether a substantial right has been affected to such a degree that we cannot confidently state that defendant's trial was fundamentally fair." *Id.* at 138. If no substantial right has been affected or no error has occurred, there is no cumulative error. Much like in the plain error test, the defendant bears the burden of persuasion with respect to prejudice. *People v. Herron*, 215 Ill. 2d 167, 185 (2005).

¶ 48        We find that Haynes has not established that the alleged errors have affected a substantial right. In fact, Haynes alleges only one error arguably capable of affecting a substantial right. He contends the prosecutor made the following three comments during closing and rebuttal arguments, which prejudiced him: (1) the prosecutor told the jury that defense counsel and Haynes were throwing up "a smokescreen" so that the jury would not see the truth; (2) the prosecutor asserted that Haynes' job was to sell drugs by stating, "We've not heard anything else about what he does"; and (3) the prosecutor told the jury, "And, remember, Alicia Brown told you that she gave him $150.00 of [OAF]."

¶ 49        "The regulation of the substance and style of closing argument lies within the trial court's discretion, and thus the court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion." *People v. Meeks*, 382 Ill. App. 3d 81, 84 (2008) (citing *People v. Caffey,* 205 Ill. 2d 52, 128 (2001)). "Defendant faces a substantial burden to achieve reversal of his conviction based upon improper remarks during closing argument." *Id.* (citing *People v. Williams,* 332 Ill. App. 3d 254, 266 (2002)). "A prosecutor is given great latitude in making closing arguments, and the trial court's determination of the propriety of the argument will stand absent a clear abuse of discretion." *Id.* (citing *People v. Cisewski,* 118 Ill. 2d

17

163 (1987)). "While a prosecutor may not make arguments or assumptions that have no basis in evidence, improper comments or remarks are not reversible error unless they are a material factor in the conviction or cause substantial prejudice to the accused." *Id.* (citing *People v. Tipton,* 207 Ill. App. 3d 688, 699–700 (1990)).

¶ 50 First, the prosecutor's "smokescreen" comment, in concert with the other comments, did not deny Haynes a fair trial. Equally, the prosecutor's comment implying that Haynes' job was that of a drug dealer, was not an improper summary of the evidence presented at trial. *People v. George James*, 2021 IL App (1st) 180509, ¶ 42 (finding "it [was] not improper for a prosecutor to refer to the defendant in a drug case as a 'businessman' or to highlight the defendant's profit motive, where there is evidence showing that the defendant sold narcotics"). The State offered evidence showing that Haynes engaged in a hand-to-hand drug transaction for profit. Finally, Haynes argues that it was error for the prosecutor to request that the jurors remember the official advance funds that Brown was given. However, that the SPD gave Brown such funds was admissible evidence demonstrating her part in the controlled buy. Thus, the prosecutor's mention of such funds during his closing argument does not constitute error. Because the errors alleged by Haynes were either not actually errors or, considered in concert, had little to no potential to negatively impact the verdict, we do not find cumulative error.

¶ 51                                          III. CONCLUSION

¶ 52 The judgment of the circuit court of Whiteside County is affirmed.

¶ 53 Affirmed.

¶ 54 JUSTICE HOLDRIDGE, specially concurring:

¶ 55 I agree with the majority in this case but solely write separately as it relates to the listening of the audio evidence replayed during deliberations (*supra* ¶¶ 19-24). As the authoring

18

justice of *People v. Hollahan*, 2019 IL App (3d) 150556, I recognize that the supreme court has since held that it is acceptable for the court to suspend jury deliberations and allow the jury to review video or audio evidence in the courtroom with non-jurors present (*Hollahan*, 2020 IL 125091, ¶¶ 24-27). Nonetheless, I maintain that the best practice in such situation remains that which I outlined in *Hollahan*, 2019 IL App (3d) 150556, ¶¶ 20-23, 28. The jury should have the opportunity to review the video or audio evidence in the jury room alone. *Id.* at ¶ 27. In cases where a video or audio recording must be played for a deliberating jury in the courtroom, the jury should view the video or listen to the audio in private, not in the presence of the parties, their attorneys, the trial judge, or court staff. *Id.* at ¶ 28. Thus, while it was proper for the court to permit the jury to listen to the audio in the courtroom, best practice prescribes allowing the jury to listen to such a recording outside the presence of anyone else.