OLD REPUBLIC INSURANCE COMPANY, Plaintiff-Appellee, v. ACE PROPERTY AND CASUALTY INSURANCE COMPANY, as Successor in Interest to the Central National Insurance Company of Omaha, Defendant-Appellant.

First District (2nd Division)    No. 1—07—2668

Opinion filed March 24, 2009.

Mound, Cotton, Wollan & Greengrass, of New York, New York (Michael H. Goldstein and Daniel J. Endick, of counsel), and Connelly, Roberts & McGivney, LLC, of Chicago (Matthew P. Connelly and Cory D. Anderson, of counsel), for appellant.

Fox, Hefter, Swibel, Levin & Carroll, LLP, of Chicago (Travis B. Wolfinger and Josh Goldberg, of counsel), for appellee.

JUSTICE CUNNINGHAM delivered the opinion of the court:

The defendant Ace Property and Casualty Insurance Company[1] (Ace Casualty), as a successor-in-interest to Central National Insurance Company of Omaha (Central National), appeals from the circuit court of Cook County's August 29, 2007, order holding that: (1) Ace Casualty's arbitration demand against the plaintiff, Old Republic Insurance Company[2] (Old Republic), is stayed; and (2) the rights and obligations of both Ace Casualty and Old Republic under all reinsurance agreements entered into between Old Republic and Central National prior to August 3, 1990, were extinguished by a commutation agreement entered into on that same date. On appeal, Ace Property alleges that: (1) the trial court's legal conclusion established in the August 29, 2007, order was inherently flawed and inconsistent with its factual findings; (2) the trial court committed reversible error when it held that the commutation agreement was not ambiguous, despite its two prior rulings to the contrary and the evidence presented at the bench trial in support of Ace Casualty's position; and (3) two of the trial court's factual findings were against the manifest weight of the evidence. For the following reasons, we affirm.

## BACKGROUND

On November 18, 1982, Old Republic issued a certificate of casualty facultative reinsurance (the certificate) to Ace Casualty's predecessor-in-interest, Central National. Under the terms of the certificate, Old Republic provided reinsurance to Central National for

---

[1]Ace Casualty is a Pennsylvania corporation doing business in Cook County, Illinois.

[2]Old Republic is a Pennsylvania corporation doing business in Cook County, Illinois.

a comprehensive liability policy issued by Central National[3] to Seattle School District #1 for the coverage period from August 31, 1982, to August 31, 1984. The face of the comprehensive liability policy issued to the Seattle School District #1 includes both the names of Central National and Cravens, Dargan & Company Pacific Coast (CDPC). At trial, Michael Davlin, a representative of Central National, testified that throughout the relevant time period, CDPC was an insurance agency that was wholly owned by Ace Casualty and that CDPC used Central National as a "fronting" company in order to write insurance policies in Central National's name. The certificate included an arbitration clause.

In 1990, Central National experienced financial difficulties and was required to be placed in rehabilitation by the State of Nebraska in which it was operating at that time. At that time, multiple reinsurance contracts existed between Central National and Old Republic—some in which Central National reinsured Old Republic, and others in which Old Republic reinsured Central National.

On February 5, 1990, representatives from both Central National and Old Republic met in Omaha, Nebraska, to discuss a proposed commutation of their reinsurance obligations. The impetus for the meeting was Central National's serious financial troubles. Central National was the party that conceived the idea of a commutation agreement. Central National owed Old Republic a significant amount of money at that time under reinsurance contracts that Central National had issued to Old Republic. Michael C. Davlin, then senior vice-president and counsel for Central National; Aldo Zucaro, Old Republic's then chairman, chief executive officer and president; and Spencer LeRoy, Old Republic's then outside counsel, all attended the meeting in Omaha. No agreement was reached at that meeting regarding the terms of a commutation.

On July 19, 1990, Zucaro, appearing on behalf of Old Republic, met again with Davlin and other Central National representatives in Nebraska to further discuss the possibility of a commutation agreement. At this time, Central National owed Old Republic approximately $18 million in reinsurance balances as a result of reinsurance contracts that Central National had issued to Old Republic. During the meeting,

---

[3]A fronting arrangement is created when "an insurer underwrites a risk of the policyholder while simultaneously passing on to a reinsurer all or virtually all of the risk and almost all of the corresponding premium. The original insurer thus merely acts as a pass through or a 'front,' and it is the reinsurer that truly assumes the risk of loss." B. Ostrager & M. Vyskocil, Modern Reinsurance Law & Practice §1.05, at 1—20, 1—21 (2d ed. 2000).

Zucaro, acting on behalf of Old Republic, accepted an offer of $3.5 million from Central National, in exchange for commutation of the liabilities owed. It is the scope of this commutation agreement that is the principle issue in this case.

The remaining terms of the commutation agreement were left for negotiation through a later exchange of draft documents. After the meeting, as part of his normal business practice, Zucaro wrote a memorandum (Zucaro memo) to LeRoy, his outside counsel, regarding the details of the meeting. The memo written by Zucaro was addressed "To Counsel at LB&B," which at trial Zucaro testified was intended for LeRoy, a lawyer at the law firm of Lord, Bissell & Brook, LLP. The memo stated:

> "As scheduled, I had a meeting today with management representatives of Central National Ins. Co.
>
> * * *
>
> They provided an update of their financial position which continues [to be] bad. They indicated that the Nebraska Department had now placed the company under an order of rehabilitation. An insurance department official now must pre-approve all transactions.
>
> We deliberated for quite a while about the true financial condition of the company. * * *
>
> At best we are looking at an asset coverage ratio of 24%. Given the problems associated with their discounting (i.e. there is little likelihood that $50 million of real money can serve to pay ultimate liabilities of $138 million or $200 million), we are probably looking at a coverage ratio of $.10 on the dollar.
>
> After some further discussions back and forth, they were willing to go back to the commissioner for an approval of a $3.5 million commutation on our balances (approximately $17.7 million at 3/31/90 (with IBNR of $5.0 million). If this were done, the pay back to us would represent $.20 on the dollar.
>
> It will be interesting to see if they can come through with this. The time value of money alone is, in my judgment, sufficient reason for us to so discount a hairy mess on our balance sheet and secure a welcomed tax deduction for us."

On July 20, 1990, Davlin, as counsel for Central National, sent LeRoy, counsel for Old Republic, an initial draft of the commutation agreement for review, the relevant portion of which is as follows:

> "THIS AGREEMENT is made effective _____ by and between OLD REPUBLIC INSURANCE COMPANY (the 'Company') and THE CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA (the 'Reinsurer').
>
> WHEREAS, the Reinsurer reinsured the Company under various

reinsurance contracts, including but not limited to reinsurance contracts issued on behalf of the Reinsurer by Cravens Re Facultative Facilities, Inc., and Transco Insurance Services, Inc. (the 'Reinsurance Agreement'); and

WHEREAS, the parties hereto now wish to fully and finally determine and settle all liabilities and obligations of the Reinsurer under the Reinsurance Agreements."

On July 26, 1990, LeRoy, as counsel for Old Republic, sent a letter to Zucaro regarding the initial draft of the commutation agreement that he had received from Davlin. In the letter, LeRoy noted that "[t]he proposed agreement is straightforward and uncomplicated," but that he had two comments concerning it. He pointed out that, first, "the agreement refers to 'various reinsurance contracts' between Central National and Old Republic," without any attempt to "list, identify or describe those contracts." Secondly, he noted that the agreement constituted "a complete mutual release between the parties with respect to all of their 'various reinsurance contracts.'" However, LeRoy indicated that the principal reinsurance liabilities arose out of the "Baccala and Shoop business," an insurance agency hired by Old Republic in 1981 to procure facultative reinsurance for policies issued by Old Republic.

The next day, on July 27, 1990, LeRoy sent Davlin a revised draft of the commutation agreement, along with a cover letter stating that the changes "consist of a slight broadening in the referred to reinsurance agreements between the parties which are the subject of the commutation and mutual releases." LeRoy's proposed changes were underlined in the text of the revised version:

"THIS AGREEMENT is made effective _____ by and between OLD REPUBLIC INSURANCE COMPANY ('Old Republic') and THE CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA ('Central National').

WHEREAS, Old Republic and Central National have heretofore entered into various reinsurance contracts with one another, under which reinsurance agreements there are or may be certain liabilities and obligations outstanding (the 'Reinsurance Agreement'); and

WHEREAS, the parties hereto now wish to fully and finally determine and settle all liabilities and obligations of the parties to each other under the Reinsurance Agreements."

After receiving LeRoy's proposed revisions, Davlin neither contacted nor questioned LeRoy about the proposed changes. The final commutation agreement, signed by the parties and made effective on August 3, 1990, incorporated all of LeRoy's proposed revisions. Articles IIA and IIB of the final version of the commutation agree-

ment remained largely unchanged from its initial draft. The only changes LeRoy made to these two sections, which were incorporated into the final version, were those that involved the names of the parties—namely, "Old Republic" in place of "the company" and "Central National" in place of "Reinsurer." Article IIA states: "In consideration of the payment described in Article I above, Old Republic does hereby release and forever discharge Central National *** from any and all liabilities and obligations of Central National arising under or related to the Reinsurance Agreements ***." Similarly, Article IIB states: "In consideration of the performance of Old Republic hereunder, Central National does hereby release and forever discharge Old Republic *** from any and all liabilities and obligations of Old Republic arising under or related to the Reinsurance Agreements ***." The commutation agreement also included a choice-of-law provision, designating that the agreement be "governed by and construed in accordance with the laws of the State of Nebraska, and the parties hereto submit to the jurisdiction of the courts (both federal and state) in Nebraska."

On January 27, 2006, Ace Casualty, as the parent company of CDPC and successor-in-interest to Central National, after seeking to collect certain sums that it alleged Old Republic owed to Ace Casualty under the terms of a November 12, 1982, certificate of reinsurance, demanded arbitration against Old Republic. On February 21, 2006, Old Republic filed a declaratory judgment action in the circuit court of Cook County and a motion to stay arbitration (motion to stay) against Ace Casualty, asserting that the commutation agreement entered into on August 3, 1990, extinguished all reinsurance contracts between Old Republic and Central National, including the certificate on which Ace Casualty sought to compel arbitration. On March 21, 2006, Ace Casualty filed a cross-motion to compel arbitration (motion to compel), arguing that the commutation agreement only extinguished those contracts by which Central National reinsured Old Republic, but not others, such as the certificate at issue, by which Old Republic reinsured Central National.

On May 17, 2006, the trial court denied Old Republic's motion to stay and Ace Casualty's motion to compel, holding that the term "various reinsurance contracts" in the commutation agreement of August 3, 1990, was ambiguous. Following the close of discovery, on April 19, 2007, the trial court denied both parties' cross-motions for summary judgment, again finding that the commutation agreement was ambiguous and, thus, rendering its interpretation a question of fact that could not be resolved by summary judgment.

On August 7, 2007, a bench trial ensued in the circuit court of Cook County during which the trial court heard extrinsic evidence

concerning the scope of the commutation agreement. Both documentary and testimonial evidence were introduced at trial. Zucaro and LeRoy both testified on behalf of Old Republic, while Davlin testified for Ace Casualty.

On August 29, 2007, the trial court entered an order and final judgment in favor of Old Republic, staying the arbitration and holding that, "[t]he rights and obligations of both parties under all reinsurance agreements entered into between Old Republic Insurance Company and Central National Insurance Company prior to August 3, 1990 were extinguished by the [commutation agreement] of August 3, 1990." The trial court found:

"1. No extrinsic evidence was introduced which definitively resolves the issue in this case. It is apparent from the testimony and letters that Spencer LeRoy III and Aldo Zucaro had a different interpretation of what was agreed upon than Michael Davlin.

2. Considering the amount owed to Old Republic by Central National and the amount settled for, it doesn't make sense that this would only be a one direction deal. It makes more sense that the commutation obligations were released in both directions.

3. That is what the executed agreement says. When Mr. LeRoy changed the terms to broaden them by making the releases mutual, Mr. Davlin did not question the changes. It says what it says and without something more specific than was presented at trial, the [c]ourt is not going to give the agreement any other interpretation 17 years later."

On September 27, 2007, Ace Casualty filed a notice of appeal before this court, requesting that the August 29, 2007, judgment of the circuit court of Cook County be reversed and the cause remanded for further proceedings.

## ANALYSIS

We determine the following two issues: (1) whether the commutation agreement was ambiguous as a matter of law; and (2) if so, whether based on the extrinsic evidence presented at trial, the trial court's interpretation of the commutation agreement was against the manifest weight of the evidence.

As an initial matter, we note that the commutation agreement contains the following choice-of-law provision:

"This [c]ommutation [a]greement shall be governed by and construed in accordance with the laws of the State of Nebraska, and the parties hereto submit to the jurisdiction of the courts (both federal and state) in Nebraska."

"Ordinarily, Illinois follows the Restatement (Second) of Conflict of Laws (1971) in making choice-of-law decisions." *Morris B. Chapman & Associates, Ltd. v. Kitzman*, 193 Ill. 2d 560, 568, 739 N.E.2d 1263,

1269 (2000); *Hall v. Sprint Spectrum, L.P.*, 376 Ill. App. 3d 822, 825, 876 N.E.2d 1036, 1041 (2007); see Restatement (Second) of Conflict of Laws §§186, 187 (1971). Sections 186 and 187 provide that the law of the state chosen by the contracting parties will apply unless: (1) the chosen state has "no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or (2) its application "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue." Restatement (Second) of Conflict of Laws §187(2), at 561 (1971). In this case, there is no question that Nebraska has a "substantial relationship" to Central National, as predecessor-in-interest to Ace Casualty, because Central National was an insurance company operating out of Omaha, Nebraska. The parties negotiated the commutation agreement in Nebraska, which was signed on behalf of Central National by its rehabilitator from the Nebraska Department of Insurance. Similarly, there are no arguments here that Illinois has a "materially greater interest" in the litigation than Nebraska. Because the parties have explicitly chosen Nebraska law to govern the interpretation of the commutation agreement, and the exceptions under section 187 are inapplicable, we will honor the choice-of-law provision. This court also notes that any potential objections to the court's personal jurisdiction over the parties have long ago been forfeited since neither Old Republic nor Ace Casualty objected to such. Rather, Old Republic and Ace Casualty, as corporations doing business in Illinois, have willingly submitted themselves to the jurisdiction of the Illinois courts.

While we apply Nebraska law to the substantive portions of our analysis in interpreting the commutation agreement, Illinois law governs the procedural application of the standard of review by which this court reviews the trial court's judgment.

We first determine whether the commutation agreement was ambiguous and review this question of law *de novo*. A contract's meaning and whether it is ambiguous are questions of law, subject to *de novo* review. *Cincinnati Insurance Co. v. Gateway Construction Co.*, 372 Ill. App. 3d 148, 151, 865 N.E.2d 395, 398 (2007); *Installco, Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 783, 784 N.E.2d 312, 319 (2002) ("[a] reviewing court will independently determine [questions of law] unrestrained by the [trial] court's judgment").

Under Nebraska law, there is a strong presumption that "a written instrument correctly expresses the intention of the parties to it." *Bedrosky v. Hiner*, 230 Neb. 200, 205, 430 N.W.2d 535, 539 (1988). The fact that the contracted parties have "opposing interpretations of the document" (*Big River Construction Co. v. L&H Properties, Inc.*, 268 Neb. 207, 212, 681 N.W.2d 751, 756 (2004)) does not necessarily mean

that the document is ambiguous because an ambiguity determination is made on an "objective basis, not by the subjective contentions of the parties" (*Bedrosky*, 230 Neb. at 204, 430 N.W.2d at 539). "Moreover, parties are bound by the terms of the contract even though their intent may be different from that expressed in the agreement." *Bedrosky*, 230 Neb. at 205, 430 N.W.2d at 539. When a contract's terms are clear, the terms must be given their "plain and ordinary meaning, as the ordinary or reasonable person would understand them." *Big River Construction, Inc.*, 268 Neb. at 212, 681 N.W.2d at 756; *Bedrosky*, 230 Neb. at 206, 430 N.W.2d at 540. However, a contract is ambiguous when, considered with other pertinent provisions as a whole, "a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings." *Gary's Implement, Inc. v. Bridgeport Tractor Parts, Inc.*, 270 Neb. 286, 298, 702 N.W.2d 355, 366 (2005); *Jensen v. Board of Regents of the University of Nebraska*, 268 Neb. 512, 518, 684 N.W.2d 537, 543 (2004); *Bedrosky*, 230 Neb. at 204-05, 430 N.W.2d at 539.

Old Republic argues that the language of the commutation agreement unambiguously provides for the commutation of all reinsurance contracts between Central National and Old Republic as of August 3, 1990, *including* the reinsurance contracts by which Old Republic reinsured Central National. Specifically, Old Republic contends that the term "various reinsurance contracts" encompassed *all* of the reinsurance agreements between Old Republic and Central National, and also argues that another provision within the commutation agreement, which stated that "the parties hereto now wish to fully and finally determine and settle all liabilities and obligations of the parties to each other under the [r]einsurance [a]greements," supports the argument that Old Republic and Central National agreed to commute *all* reinsurance contracts entered into between them. Ace Casualty argues that the commutation agreement, which used the term "various reinsurance contracts," refers to the reinsurance contract in which Central National reinsures Old Republic but not those in which Old Republic reinsures Central National. Ace Casualty discounts the language of the agreement which says that the parties agree to settle "all liabilities and obligations to each other." Ace Casualty makes a conflated argument which includes certain language from the agreement, as well as extrinsic evidence presented to the trial court, and concludes that taken as a whole, its argument establishes that "all" does not really mean "all." In other words, "all liabilities" means something less than *all liabilities and obligations of the parties to each other*. We disagree.

We find that the term "various reinsurance contracts" in the commutation agreement, when considered in conjunction with other provi-

sions of the contract as a whole, did not render the commutation agreement ambiguous. The second paragraph of the commutation agreement stated that "Old Republic and Central National have heretofore entered into various reinsurance contracts with one another, under which reinsurance agreements there are or may be certain liabilities and obligations outstanding (the '[r]einsurance [a]greements')." The third paragraph of the commutation agreement stated that the parties "now wish to fully and finally determine and settle *all liabilities and obligations of the parties to each other under the [r]einsurance [a]greements.*" (Emphasis added.) When read together, the plain language of the provisions is clear that the parties intended to commute *all* of the reinsurance agreements between Old Republic and Central National, including those by which Old Republic reinsured Central National. Also, articles IIA and IIB of the commutation agreement, by explicitly stating that each party would "hereby release and forever discharge" the other party from "any and all liabilities and obligations" arising under or related to the reinsurance agreements, further indicated that both parties agreed to a global commutation of *all* reinsurance agreements. We cannot say that the term "various reinsurance contracts," when considered in conjunction with other pertinent provisions in the commutation agreement as a whole, was susceptible to multiple, conflicting interpretations. We decline to give the language of the commutation agreement any other meaning than that which is plainly stated. The parties themselves said it best in the third paragraph of the document where they agree to "fully and finally *** settle all liabilities and obligations of the parties to each other under the [r]einsurance [a]greements." Thus, all of the provisions in the commutation agreement, when read as a whole, reflected the parties intention to extinguish *all of the* various *reinsurance agreements* existing between the parties, including those by which Old Republic reinsured Central National. Therefore, we hold that the commutation agreement was unambiguous as a matter of law. See *IMC Global v. Continental Insurance Co.*, 378 Ill. App. 3d 797, 805, 883 N.E.2d 68, 76-77 (2007) (a reviewing court "may affirm the judgment of the circuit court on any basis in the record").

Because we hold that the commutation agreement was unambiguous as a matter of law, we need not determine whether the trial court's interpretation of the commutation agreement, based on the extrinsic evidence presented at trial, was against the manifest weight of the evidence.

Affirmed.

KARNEZIS, P.J., and HOFFMAN, J., concur.