2026 IL App (1st) 242294-U

No. 1-24-2294

Order filed March 11, 2026

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| POHJOLA INSURANCE LTD., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CH 11330 |
| | ) | |
| THE CONTINENTAL INSURANCE COMPANY, | ) | Honorable |
| | ) | Clare J. Quish, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Martin and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Summary judgment in favor of the reinsurer was not proper where (1) reasonable persons could draw different inferences from the facts regarding the existence of reinsurance agreements between the parties, and (2) genuine issues of material fact exist regarding the reinsurer's claims of prejudice in support of its defense of late notice of claims.

¶ 2    In this action for declaratory relief, where the parties filed cross-motions for summary judgment, the circuit court granted summary judgment in favor of plaintiff Pohjola Insurance Ltd. (Pohjola) and against defendant The Continental Insurance Company (Continental). The circuit

court ruled that Continental failed to show that it had any reinsurance agreements with Pohjola related to two comprehensive general liability insurance policies, which Continental had issued to a manufacturing business.

¶ 3     On appeal, Continental argues that the circuit court erred by finding that the underwriting file documents lacked authentication and no questions of fact existed regarding whether Pohjola reinsured Continental.

¶ 4     For the reasons that follow, we reverse the judgment of the circuit court.[1]

¶ 5                            I. BACKGROUND

¶ 6     Plaintiff Pohjola is a Finnish insurance and reinsurance[2] company. Pohjola insured Metso Corporation (Metso), a Finnish conglomerate with interests in manufacturing, mining, and lumber. Pohjola arranged for subsidiaries of Metso doing business outside of Finland to be insured by local insurance companies, which then reinsured 100% of the risk back to Pohjola. Neles, Inc. (Neles) was a subsidiary of Metso and had a valve manufacturing business in the United States.

¶ 7     In 1986 and 1987, defendant Continental issued comprehensive general liability insurance policies to Neles (*i.e.*, the 1986-1987 and 1987-1988 Neles policies). In about 1988, Neles merged with Jamesbury Corporation, a United States company that was also in the valve business. The

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2]     "Reinsurance is the insurance of one insurer by another. See *Matter of Union Indemnity Insurance Co. of New York*, 89 N.Y.2d 94, 105-106 (1996). 'When entering into a reinsurance contract, an insurance company agrees to pay a particular premium to a reinsurer in return for reimbursement of a portion of its potential financial exposure under certain direct insurance policies it has issued to its customers.' *Travelers Casualty & Surety Co. v. Certain Underwriters at Lloyd's of London*, 96 N.Y.2d 583, 587 (2001). 'Through this indemnity relationship, the reinsured seeks to "cede" or spread its risk of loss among one or more reinsurers.' *Id.*" *Global Reinsurance Corporation of America v. Century Indemnity Co.*, 30 N.Y.3d 508, 512-13 (N.Y. 2017).

resulting company was named Neles-Jamesbury, Inc. (NJI). In the mid-1990s, Continental merged into the CNA Insurance Companies (CNA).

¶ 8    On July 28, 2004, NJI claimed coverage under the Neles policies for asbestos bodily injury liabilities. Continental and NJI proceeded to negotiate the coverage issues. In 2007, they entered into a confidential defense cost sharing agreement whereby Continental agreed to pay a 7.7% share of NJI's asbestos defense costs incurred after July 28, 2004. Continental also conducted a search for reinsurance in 2007, and a Continental system abstract indicated no reinsurance. However, in early 2021, Continental undertook a review of underwriting files and discovered documents that, according to Continental, show that Pohjola had reinsured the Neles policies.

¶ 9    In April 2021, Continental sent Pohjola notice of the Neles asbestos loss. In October 2021, Continental sent Pohjola an initial reinsurance billing for over $1.8 million. In November 2021, Pohjola sent Continental an e-mail response, stating:

> "We simply need to know more about what this relates to. The only time we have been involved with Neles, as far as I am aware, is when we insured Metso Corporation, to which group Neles belonged. We thus insured (directly) the parental group and arranged for the subsidiaries to be insured via network partners, which risk was then reinsured to us. I am unaware CNA did this for us, but the documents seem to suggest this was the case here."

In a January 2022 e-mail from Pohjola to Continental, Pohjola stated that it questioned whether it was even liable for asbestos losses under the relevant reinsurance and raised concerns about late notice.

¶ 10    Thereafter, Pohjola argued that Continental's evidence had not proven the existence or terms and conditions of Pohjola's reinsurance and raised late notice as a defense. Pohjola did not pay the reinsurance billings and claims that it has no records respecting the reinsurance. Pohjola's corporate representative testified at his deposition in this case that Pohjola would have destroyed any records it may have had respecting its reinsurance of Continental after 10 years. Accordingly, Pohjola would not have had any Continental reinsurance records after 1998, which was six years before any claims were made under the Neles policies.

¶ 11    In November 2022, Pohjola sued Continental in the circuit court of Cook County. Pohjola sought negative declaratory relief that Continental had failed to prove the existence and terms of Pohjola's reinsurance respecting the Neles policies, that notice was untimely, and that Pohjola had no obligation to reimburse the defense costs Continental pays under the Neles policies.

¶ 12    Continental answered and counterclaimed, attaching as exhibits to its pleading the underwriting files for the Neles policies, which included a reinsurance certificate[3] for the 1986-1987 Neles policy, 1987 and 1988 internal Continental correspondence regarding Pohjola's 100% reinsurance, administration worksheets showing the premium owed to Pohjola, and Continental's coding documents showing that the insurance and reinsurance premium transactions were

---

[3]Reinsurance covering a specific policy, known as facultative reinsurance, is typically memorialized in a certificate. *Global Reinsurance Corporation of America*, 30 N.Y.3d at 513 (citing Barry R. Ostrager & Mary Kay Vyskocil, *Modern Reinsurance Law and Practice* § 1:03 (3d ed. 2014); *accord* William Hoffman, *Facultative Reinsurance Contract Formation, Documentation, and Integration*, 38 Tort Trial & Insurance Practice Law Journal 763, 809 (Spring 2003) ("By a certificate, the reinsurer attests that the facultative reinsurance placement is complete and the contract in effect")).

"These certificates are usually 'standard forms' (*North River Insurance Co. v CIGNA Reinsurance Co.*, 52 F.3d 1194, 1199 (3d Cir. 1995)), 'short and concise, using terms of art rather than lengthy, legalistic explications to define the obligations of the parties.' Ostrager & Vyskocil § 2:02; *see Sumitomo Marine & Fire Insurance v. Cologne Reinsurance Company of America*, 75 N.Y.2d 295, 302 (1990)." *Global*, 30 N.Y.3d at 513.

processed. Continental sought damages for Pohjola's breach of contract and a declaration of the parties' rights and obligations under the reinsurance agreements.

¶ 13    Following discovery, both parties moved for summary judgment. Regarding the choice of law issue, Pohjola argued that Illinois substantive law applied, whereas Continental argued for New York law.

¶ 14    After hearing argument, the circuit court issued a written order on October 23, 2024, that granted Pohjola's motion for summary judgment and denied Continental's. On the existence of reinsurance issue, the court found no conflict between Illinois and New York law and thus determined that there was no need to decide the choice of law on that issue. The court listed some of the documents Continental submitted to establish the existence of the reinsurance agreements— *i.e.*, a copy of a reinsurance certificate, the 1987 Continental letter, and the March 1988 premium administration worksheets—and stated that these documents were not authenticated. The court then cited authority for the proposition that, "[w]ithout proper authentication and identification of the documents, the proponent of the evidence has not provided a proper foundation and the document cannot be admitted into evidence." However, despite the lack of authentication, the court reviewed Continental's evidence and concluded that it merely showed that Continental and Pohjola contemplated entering into a reinsurance agreement, but did not show that Pohjola ever agreed to or accepted a reinsurance agreement with Continental. Based on the court's decision that Continental failed to show the existence of the reinsurance agreements with Pohjola, the court did not address the late notice issue.

¶ 15    Continental timely appealed.

¶ 16                                    II. ANALYSIS

¶ 17    The standard of review for a trial court's decision on a motion for summary judgment is *de novo. Sameer v. Butt*, 343 Ill. App. 3d 78, 85 (2003). Summary judgment is a drastic means of disposing of litigation (*Loyola Academy v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 271 (1992)), and is available only where the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" (735 ILCS 5/2-1005(c) (West 2020)). The purpose of summary judgment is not to try a question of a fact, but simply to determine whether a genuine issue of triable fact exists. *Watkins v. Schmitt,* 172 Ill. 2d 193, 203 (1996). A genuine issue of material fact exists not only when the facts are in dispute, but also where reasonable persons could draw different inferences from undisputed facts. *Loyola Academy*, 146 Ill. 2d at 272. Therefore, summary judgment is proper only when undisputed facts admit but one reasonable inference. *In re Estate of Jessman*, 197 Ill. App. 3d 414, 419 (1990).

¶ 18    The burden of establishing that no genuine issue of material fact exists is on the moving party. *Becovic v. Harris Trust & Savings Bank*, 128 Ill. App. 3d 107, 119 (1984). "[A]lthough the nonmoving party in a summary judgment motion is not required to prove his or her case, the nonmovant must nonetheless present a factual basis which would arguably entitle that party to a judgment." *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 517 (2000). When ruling on a motion for summary judgment, a trial court must view all the evidence in a light most favorable to the nonmovant. *Williams v. Covenant Medical Center*, 316 Ill. App. 3d 682, 687-88 (2000). In addition, any evidence that would be inadmissible at trial cannot be considered by the

court in support of or in opposition to the motion for summary judgment. *Watkins,* 172 Ill. 2d at 203-04.

¶ 19 "Summary judgment may be granted on cross-motions for summary judgment where it is clear that all material facts are before the court, the issues are defined, and the parties agree that only a question of law is involved." *Travelers Indemnity Co. v. Rogers Cartage Co.*, 2017 IL App (1st) 160780, ¶ 10. "But it is also true that the mere filing of cross-motions for summary judgment does not obligate the circuit court to grant one of the motions [citation], and if reasonable people could draw different inferences from the undisputed facts, summary judgment is inappropriate [citations]." *Id*.

¶ 20 Continental argues that New York law applies to the parties' claims because nearly all of the significant contacts related to the applicable insurance policies and alleged reinsurance agreements took place in New York. Pohjola argues that Illinois law applies as the law of the forum.

¶ 21 Illinois choice-of-law rules determine the substantive law in this case. *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 155 (2007). A choice-of-law determination is required only when a difference in law will make a difference in the outcome. *Id*. First, a court must determine if there is a conflict in the laws of the two states. *SBC Holdings, Inc. v. Travelers Casualty & Surety Co.*, 374 Ill. App. 3d 1, 13 (2007). "A conflict exists if the difference in laws will result in a difference in outcomes." *Id*. If the law of the jurisdiction in question is essentially the same on the disputed issue, there is no need to apply a choice-of-law analysis. *Id*. In the absence of a conflict, Illinois law applies as the law of the forum. *Id*.

¶ 22                    A. Authentication of the Underwriting File Documents

¶ 23    Continental argues that the circuit court erred by finding that Continental's evidence concerning the existence of the reinsurance agreements, *i.e.*, multiple documents from Continental's underwriting files for the Neles policies, were not authenticated and therefore not admissible at trial or on summary judgment. Continental does not raise any conflict in the laws of Illinois and New York concerning this issue. In the absence of a conflict, Illinois law applies as the law of the forum. *Id.* We review the circuit court's ruling concerning an evidentiary matter, including an authentication issue, under the abuse of discretion standard. *People v. Johnson*, 361 Ill. App. 3d 430, 440 (2005). A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the trial court. *Id.*

¶ 24    "[T]he bar for authentication of evidence is not particularly high." (Internal quotation marks omitted.) *People v. Watts*, 2022 IL App (4th) 210590, ¶ 82. "[T]he standard for authentication, and hence for admissibility, is one of reasonable likelihood" that the evidence is what it is purported to be. (Internal quotation marks omitted.) *People v. Reynolds*, 2021 IL App (1st) 181227, ¶ 57; see Ill. R. Evid 901(a) (eff. Sept. 17, 2019) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.").

¶ 25    First, Continental argues that authentication was a nonissue because Pohjola admitted that the documents at issue (*i.e.*, a purported copy of a reinsurance certificate respecting the 1986-1987 Neles policy; a June 11, 1987, letter; a March 3, 1988, letter; and premium administration worksheets) were authentic when Pohjola stated in its summary judgment motion that the documents were "true and correct" copies. Continental adds that Pohjola forfeited the right to

contest the authenticity or admissibility of the underwriting documents by failing to challenge this evidence before the trial court and by even submitting this evidence to the trial court as part of the summary judgment record. See *Healy v. Owens-Corning Fiberglas*, 187 Ill. App. 3d 182, 187 n.9 (1989) (doctor's unauthenticated letter may properly be considered on review where the plaintiffs relied upon the letter, without objection, in their argument against the motion for summary judgment and the defendants invited the circuit court to examine the plaintiff's medical records). Furthermore, Continental argues that even if the underwriting documents were not formally authenticated by an affidavit, the documents are properly considered because they were attached to Continental's counterclaim. See *Law Offices of Colleen M. McLaughlin v. First Star Financial Corp*, 2011 IL App (1st) 101849, ¶¶ 33-34 (under section 2-606 of the Illinois Code of Civil Procedure (735 ILCS 5/2-606 (West 2008)), plaintiffs are required to attach to their complaint the written instruments upon which their claim is based, and courts treat such exhibits as part of the complaint itself).

¶ 26    In addition, Continental argues that the underwriting documents satisfied the requirement of authentication as a condition precedent to admissibility because the documents are ancient documents since they (1) were in such condition as to create no suspicion concerning their authenticity, (2) were located in a place where, if authentic, they would likely be, and (3) had been in existence 20 years or more at the time they were offered. See Ill. R. Evid. 901(b)(8) (eff. Sept. 17, 2019). Specifically, Continental contends that nothing in the underwriting documents suggested they were fabrications; the documents are standard insurance company records respecting the payment of premium to a reinsurer in exchange for insurance, complete with 1987 and 1988 date stamps; these premium transaction documents were located in Continental's

underwriting files for the Neles policies, which is as expected; and the documents were over 35 years old when they were offered.

¶ 27    In response, Pohjola argues that Continental forfeited its arguments that Pohjola admitted the authenticity of the documents and that the documents qualify as ancient records because Continental failed to raise these arguments when the trial court asked about authentication at oral argument. See *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 413 (2002) (finding argument forfeited when not made in the trial court). Pohjola adds that it did not admit the authenticity of the documents but merely identified the documents as coming from Continental's document production. Further, Pohjola argues that the rule simplifying the admission of ancient documents does not apply to the copy of the reinsurance certificate because considerable suspicion exists concerning its authenticity since no evidence exists regarding who prepared the document or when, nor that it is complete, nor that Pohjola ever knew about it.

¶ 28    Our review of the circuit court's written order establishes that the court did not actually rule that Continental's evidence was inadmissible at summary judgment. To the contrary, the court reviewed all the evidence submitted by Continental despite any lack of authentication and granted summary judgment in favor of Pohjola based on the court's finding that Continental's evidence merely showed that Continental and Pohjola contemplated entering into reinsurance agreements, but did not show that Pohjola ever agreed to or accepted reinsurance agreements with Continental. We find that the circuit court did not abuse its discretion by considering Continental's evidence where Pohjola not only failed to timely object to that evidence but also submitted it to the trial court. See *Healy*, 187 Ill. App. 3d at 187 n.9.

¶ 29                                  B. Existence of Reinsurance Agreements

¶ 30     Before the circuit court, Continental did not identify any conflict between Illinois and New York law as to the issue of the existence of the reinsurance agreements. Accordingly, the circuit court did not perform a choice-of-law analysis and applied Illinois law to this issue. However, on appeal, Continental contends for the first time that a conflict exists between Illinois and New York law concerning whether reinsurance agreements have to be memorialized in written contracts. Specifically, Continental asserts that the circuit "court's core holding—that the absence of signed reinsurance contracts 'negates the existence of these agreements'—profoundly conflicts with [the long recognized principle of New York courts] that reinsurance agreements do not have to be memorialized in written contracts."

¶ 31     Continental's assertion of a conflict of law lacks merit. Both New York and Illinois law authorize the consideration of secondary evidence to prove the existence of a written contract that is missing or lost. See *e.g.*, *Burt Rigid Box, Inc. v. Travelers Property Casualty Corp.*, 302 F.3d 83, 91 (2d Cir. 2002); *Sears, Roebuck & Co. v. Seneca Insurance Co.*, 254 Ill. App. 3d 686, 691 (1993). Moreover, Continental misconstrues the ruling of the circuit court by taking out of context the court's statement concerning one argument made by Continental. Specifically, the court stated that Continental's argument that Pohjola's signature on the certificates was not necessary to show a meeting of minds is contradicted by the contents of the 1988 letter, which stated that Continental's representative was in the process of obtaining Pohjola's signature. Contrary to Continental's argument on appeal, the circuit court did not hold that reinsurance agreements have to be memorialized in signed contracts. Rather, the circuit court held that Continental, which relied upon its own internal documents, failed to establish the existence of a reinsurance policy because

Continental failed to provide evidence of, *inter alia*, any role Pohjola had in the creation of the reinsurance certificate, proof of payment by Continental to Pohjola, and communications between Continental and Pohjola.

¶ 32    Because we conclude that Illinois and New York law are essentially the same concerning the issue of the existence of the reinsurance agreements, we do not conduct a choice-of-law analysis on this issue and apply Illinois law as the law of the forum. *SBC Holdings, Inc.*, 374 Ill. App. 3d at 13.

¶ 33    Continental argues that, where the record teemed with questions of fact, Continental presented sufficient evidence to support a reasonable inference that Pohjola reinsured Continental for the Neles policies, but the circuit court improperly resolved disputed questions of fact, misapplied the summary judgment standard, misconstrued the secondary evidence, and misinterpreted established legal authority respecting lost contracts. To show the existence of the reinsurance agreements, Continental relied on the documents it found in its underwriting file for the Neles policies and the circumstances about how Pohjola did business in the United States at the time.

¶ 34    First, Continental offered a one page, unsigned, and undated document entitled "Continental Insurance Company Reinsurance Certificate." See *Unigard Security Insurance Co., Inc. v. North River Insurance Co.*, 79 N.Y.2d 576, 582 (N.Y. 1992) ("A certificate of reinsurance is a contract between two insurance companies in which the reinsured company agrees to cede part of its risk to the reinsurer in return for a percentage of the premium.") This document states that Neles is the insured, Continental is the ceding company, and Pohjola is the reinsurer for 100% of the $2 million limit of the 1986-1987 Neles policy. This certificate also states the deductible

amount, composite rate, deposit premium, ceding fee, and term. The back side of this document is blank. No evidence indicates who created this document, when it was created, whether Pohjola was involved in the creation of this document, or whether this document was ever sent to or received by Pohjola.

¶ 35    Second, Continental offered a June 3, 1987, letter from the casualty manager of Continental's global accounts group to Continental's rate and code department. The casualty manager refers to an attached "scratch copy" of the 1986-1987 Neles policy and states that the renewal policy should be "issued for the period 4/24/86-87, at the agreed premium of [$]260,000 less 15% commission." This letter identifies the agent in Massachusetts and states that "100% reinsurance is to be coded back to" Pohjola to the attention of Juhani Talvia. (In a deposition in this case in 2023, Pohjola's corporate representative confirmed that Juhani Talvia was a Pohjola employee.) The letter instructs that all checks should be mailed to Pohjola in care of Continental's London office and to the attention of Jim Fleming, who was Continental's underwriter for the Neles policies. There are no attachments to this letter.

¶ 36    Third, Continental offered a March 3, 1988, letter from Fleming to a representative in Continental's Virginia office, which enclosed the premium administration worksheets for the 1986-1987 and 1987-1988 Neles policies. Regarding the worksheets for the 1987-1988 Neles policy, Fleming stated that these worksheets will allow the letter recipient "to book the original premium as well as process the reinsurance transactions. The broker has already paid the premium, so no bill should be generated." Fleming also stated that "[u]pon receipt of the final sales figure from the broker, I will process an endorsement to adjust the premium. No physical audit is required." Further, Fleming stated that he had sent reinsurance certificates to Pohjola for their

signature and would send signed copies to the letter recipient upon receipt, but Fleming's letter authorized the recipient to process the original premium and reinsurance premium before the signed certificates were returned.

¶ 37    The enclosed worksheets for the 1987-1988 Neles policy were for processing the policy premium and the reinsurance premium—$263,250 gross, subject to a 40.5% ceding commission. These worksheets indicate that Pohjola reinsured 100% of the 1987-1988 Neles policy. Fleming also enclosed a worksheet concerning the 1986-1987 Neles policy because the final adjusted premium for that policy had been determined following an audit of the Neles sales ($235,027, adjusted downward from the advance premium of $260,000). This worksheet indicates that Pohjola reinsured 100% of the 1986-1987 Neles policy in exchange for 100% of the final premium, minus a ceding commission.

¶ 38    Fourth, Continental offered the coding sheets from the 1986-87 and 1987-1988 underwriting files for the Neles policies. The coding sheets show that the direct and reinsurance premiums were processed (*i.e.*, "booked") in March 1988. This secondary evidence shows that Continental processed an adjusted, final premium to Pohjola 11 months after the expiration of the 1986-1987 policy. Moreover, the 1987-1988 Neles policy reinsurance premium was being processed around the time that policy was expiring. Because parties do not contemplate insuring or reinsuring a risk after it has already expired, Continental argues that it would be unreasonable to infer from Continental's processing of these transactions that Continental merely hoped to enter into a 100% reinsurance relationship with Pohjola for the Neles policies. Rather, it would be reasonable to infer that these documents show the normal administrative processing of reinsurance transactions pursuant to reinsurance agreements already agreed upon by the parties.

¶ 39    Finally, Continental offered the circumstances about how Pohjola did business in the United States at the time. Specifically, Pohjola and Metso, the parent company of Neles, were Finnish companies, and Pohjola insured Metso and its affiliates. When Metso or its subsidiaries expanded their business into foreign markets, their insurance coverage would come from a local carrier, which would then 100% reinsure the risk with Pohjola. This practice, also known as fronting, was not unusual in the insurance industry (*Old Republic Insurance Co. v. Ace Property & Casualty Insurance Co.*, 389 Ill. App. 3d 356, 358 (2009)), and enabled unlicensed foreign insurance companies like Pohjola to participate in risks in the United States. Continental also showed that Pohjola had reinsured the Neles risk in the 1980s independently of Continental. Specifically, Pohjola had another American insurer (which Continental referred to as "Lumbermens") front the Neles risk for Pohjola in 1988.

¶ 40    Pohjola argues that the circuit court properly granted summary judgment in Pohjola's favor because Continental's secondary evidence does not establish that Pohjola ever agreed to or accepted a reinsurance agreement with Continental where the purported reinsurance certificate is neither signed nor dated and Continental offered no evidence regarding the creation of this document. Pohjola also argues that the back side of a one-page, two-sided reinsurance certificate typically sets forth the terms and conditions applicable to that coverage, but Continental's purported certificate is blank on the back side. Moreover, Pohjola argues that there are no signatures of any Pohjola representative on any document, no evidence of communications with anyone at Pohjola about such agreements, and no testimony from any witness as to Pohjola's acceptance of any of the terms of the alleged reinsurance agreements.

¶ 41 Pohjola, however, cites no authority for the proposition that the secondary evidence had to emanate from or be delivered to and acknowledged by Pohjola before it could support Continental's position. To the contrary, evidence from the insured, such as documents showing premium payments, historical financial statements citing coverage from the insurer, or testimony from the insured's representative recalling the coverage, can suffice. See *Burt Rigid Box, Inc.*, 302 F.3d at 92 (insured's financial statements and testimony); *PSI Energy, Inc. v. Home Insurance Co.*, 801 N.E.2d 705, 720 (Ind. Ct. App. 2004) (insured's record of premium payments). Also, the very circumstances surrounding the insurer's business at the pertinent time can serve as secondary evidence proving coverage. *Westport Insurance Corp. v. California Casualty Management Co.*, 249 F. Supp. 3d 1164, 1171-72 (N.D. Cal. 2017) (secondary evidence of lost policy can include policies the insurer sold to other insureds with similar claims).

¶ 42 Regarding the absence of text on the back page of the copy of the reinsurance certificate, Continental explains that the missing terms of Pohjola's reinsurance of American fronting companies in the 1980s appeared on the back page of the two-sided paper reinsurance certificate. See Hoffman, *supra* note 3, at 814 (the general conditions printed on the reverse side of the reinsurance certificate "represent the reinsurer's standard terms for the sale of its facultative capacity"). Continental adds that "[t]wo-sided paper reinsurance certificates issued decades ago have been known to reach the current era with only one side photocopied." Further, Continental states that the missing reinsurance terms are shown from Pohjola's admissions respecting its obligations as a 100% reinsurer and the Lumbermens-Pohjola reinsurance contract, which shows the terms on which Pohjola was reinsuring its American fronting companies in the 1980s. See *Westport Insurance Corp.*, 249 F. Supp. 3d at 1171-72 (similar policies issued in the same time

period are valid secondary evidence of the contents of lost policies); *Rogers v. Prudential Insurance Co.*, 218 Cal. App. 3d 1132, 1137 (Ct. App. 1990) (same).

¶ 43    Pohjola also argues that, although Continental's secondary evidence shows that Continental expected to make premium payments to Pohjola, Continental failed to produce any cancelled checks or other evidence showing that Pohjola accepted payment for providing reinsurance. Pohjola states that the March 1988 internal worksheets were dated nearly two years after the reinsurance of the 1986-1987 Neles policy incepted and did not show that Pohjola had assented to the reinsurance. Similarly, the March 1988 letter from Continental underwriter Fleming shows that he was referring to provision of the reinsurance certificates to Pohjola and payment of the reinsurance premium nearly a year after the 1987-1988 reinsurance would have taken effect. Furthermore, Pohjola's practice of acting as a reinsurer for certain affiliates of Metso shows only that Pohjola had the ability to serve as a reinsurer for a policy issued to Neles, not that Pohjola actually did. Pohjola argues that that these documents, taken together, showed that Continental and Pohjola merely contemplated entering into a reinsurance agreement, but did not show they actually entered into an agreement.

¶ 44    Continental responds that "[l]ost insurance policies and reinsurance contracts are a fact of life in liability insurance," and the absence of cancelled checks or other documents here is not compelling given Pohjola's practice of destroying documents after 10 years and the passage of much time in this matter. Moreover, the passage of much time in this insurance claim case is not unusual because asbestos claims often involve bodily injury that does not manifest until decades after the exposure to an asbestos-containing product. See *King v. Paul J. Kez Co.*, 323 Ill. App. 3d 532, 535 (2001) (lawsuit filed after exposure between 1964 and 1970 and diagnosis in 1995).

Continental adds that it offered internal correspondence and worksheets that show the direct policy and reinsurance premiums were "booked," or processed. Continental also states that documentation concerning the processing of reinsurance coverage after the inception of that coverage is not unusual in the reinsurance industry. See *Sumitomo Marine and Fire Insurance Co., Ltd.—U.S. Branch*, 75 N.Y.2d at 302 (citing 1 John Butler & Robert Merkin, *Reinsurance Law*, A5.1-02 (1986), for the proposition that "[d]elivery of the original insurance policy to the reinsurer and issuance by the latter of a formal certificate of reinsurance may not occur until much later, and indeed are technically unnecessary for a binding agreement"). Furthermore, the premium provision in the 1986-1987 Neles policy provided that the advance premium paid by Neles was based on an estimate of its sales and the final premium would be computed based on an audit to determine the actual sales figure when the policy expired. Accordingly, this resulted in Continental returning to Neles a portion of the advance premium it had paid, and Continental processed this final premium transaction, including the payment of the reinsurance premium to Pohjola, in March 1988.

¶ 45 Pohjola also argues that Continental failed to meet its burden to demonstrate that it made a diligent search and, thus, cannot use the secondary evidence on which it relies. See *Central Illinois Light Co. v. Home Insurance Co.*, 342 Ill. App. 3d 940, 961 (2003) ("In order to introduce secondary evidence of a writing, a party must first prove: (1) prior existence of the original; (2) that the document is lost, missing, destroyed or unavailable; (3) the substitute is authentic; and (4) the party has been unable to locate the policies through a diligent search."). Specifically, Pohjola argues that Continental failed to promptly discover the secondary evidence because Continental waited too long to conduct its searches and should have found the secondary evidence at least during the 2007 search.

¶ 46 According to the record, in July 2004, NJI claimed coverage under Continental's Neles policies. In 2007, when Continental agreed to pay a share of NJI's defense costs, Continental conducted a search for reinsurance, and a Continental system abstract indicated no reinsurance. However, in early 2021, Continental undertook a review of underwriting files and discovered the documents that constitute Continental's secondary evidence in this case.

¶ 47 Pohjola's diligent search argument lacks merit. Pohjola presents no authority to support its proposition that the diligent search requirement means prompt discovery of the secondary evidence. Furthermore, no diligence requirement appears in Illinois Rule of Evidence 1004, which became effective January 1, 2011, and governs the admission of secondary evidence in a lost contract case. Nevertheless, Continental presented sufficient evidence to show that it made a properly thorough search for the original document to enable the conclusion that the original is lost. See *Central Illinois Light Co*, 342 Ill. App. 3d at 961. The record includes sworn testimony about the searches undertaken for policy, underwriting, and reinsurance contract documents. The record also includes Continental's prelitigation request to Pohjola that it search its own records.

¶ 48 We conclude that reasonable minds could draw different conclusions from the facts that were before the circuit court. Looking at Continental's secondary evidence in the light most favorable to Continental, it would take a fact finder to conclude whether or not Continental can establish by a preponderance of the evidence that Pohjola reinsured the Neles policies. Specifically, Continental produced (1) a copy of a document entitled "reinsurance certificate," which set forth the term, premium, and limits of Pohjola's reinsurance coverage, (2) contemporaneous letters wherein Continental's underwriting and policy coding representatives discuss details of Pohjola's reinsurance of Continental for the Neles policies, that Pohjola is to be

paid the reinsurance premiums, the processing of those payments, arrangements to sign the reinsurance certificates, and the name of the particular Pohjola representative to include in the coding of the 100% reinsurance from Pohjola, (3) worksheets concerning the processing of the direct policy and reinsurance premiums, and (4) coding sheets showing that the direct and reinsurance premiums were processed in March 1988. These documents show the essential terms of Pohjola's reinsurance coverage, *i.e.*, the subject, amount, and rate (see *Zannini v. Reliance Insurance Company of Illinois Inc.*, 147 Ill. 2d 437, 454 (1992)), and a fact finder could conclude that Continental would not have these documents in its underwriting files for the Neles policies yet not be reinsured by Pohjola. In addition, Continental offered evidence that Pohjola (1) acknowledged its business practice of 100% reinsuring local companies that insured Finnish businesses, (2) reinsured 100% an American policy covering Finnish-owned Neles in the same time period as the policies at issue, and (3) destroyed documents after 10 years and so would not have any records concerning its reinsurance of the Neles policies.

¶ 49     Contrariwise, a fact finder could also reasonably conclude that the documents found in the Neles underwriting files and Pohjola's business practices show that Continental and Pohjola were only considering whether there would be reinsurance of the Neles policies.

¶ 50     Accordingly, because the facts in this case do not lead to only one reasonable conclusion, we hold that summary judgment on the issue of whether a reinsurance agreement exists between Continental and Pohjola was inappropriate.

¶ 51                           C. Late Notice of Loss Defense

¶ 52     Pohjola pleaded a late notice of loss defense, which went unaddressed by the trial court on summary judgment. On appeal, Pohjola offers its late notice defense as an alternative basis to

affirm the trial court's award of summary judgment in Pohjola's favor. Specifically, Pohjola argues that Continental's failure to give timely notice of the underlying asbestos claims to Pohjola constituted a basis for Pohjola to deny coverage.

¶ 53    A conflict exists between Illinois and New York law regarding a reinsurer invoking the defense of late notice of loss by the reinsured. New York law requires a reinsurer raising a late notice defense to prove prejudice in the form of tangible economic injury. *Unigard Security Insurance Co., Inc.* 79 N.Y.2d at 584. Illinois, however, does not require that a reinsurer prove prejudice, identifying it as only one factor among many to consider in assessing the reasonableness of notice. *Country Mutual Insurance Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303, 313 (2006). Thus, we must determine which law applies. See *Windmill Nursing Pavilion, Ltd. v. Cincinnati Insurance Co.*, 2013 IL App (1st) 122431, ¶ 23.

¶ 54    Pohjola contends that Illinois law applies because Illinois is the law of the forum Pohjola selected. Continental responds that New York law applies because most of the significant contacts occurred there.

¶ 55    "Subject to constitutional limitations, the forum court applies the choice-of-law rules of its own state." *Townsend*, 227 Ill. 2d at 155. In contract cases, Illinois applies the "most significant contacts" test set forth in section 188 of the Restatement (Second) of Conflict of Laws. *Safeco Insurance Co. v. Jelen*, 381 Ill. App. 3d 576, 580 (2008). Under this test, the court considers factors such as the place of contracting; the place of negotiations; the place of performance; the location of the subject matter of the contract; and the domicile, residence, nationality, place of incorporation, and place of business of the parties. Restatement (Second) of Conflict of Laws § 188 (1971); see *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.,* 166 Ill. 2d 520,

526-27 (1995) (quoting *Hofeld v. Nationwide Life Insurance Co.,* 59 Ill. 2d 522, 528 (1975), for the proposition that "[a]bsent an express choice of law, insurance policy provisions are generally 'governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract' ").

¶ 56    These factors are not all of equal significance and "are to be evaluated according to their relative importance with respect to the particular issue." Restatement (Second) of Conflict of Laws § 188(2) (1971); *Employers Insurance of Wausau v. Ehlco Liquidating Trust,* 309 Ill. App. 3d 730, 739 (1999). To guide the court's analysis, courts evaluate these factors in light of the underlying choice-of-law principles listed in section 6 of the Restatement (Second) of Conflict of Laws, which include the needs of the interstate and international systems; the relevant policies of the forum and other interested states, as well as those other states' relative interests in the determination of the particular issue; protection of justified expectations; basic policies underlying the particular field of law; the certainty, predictability, and uniformity of the result; and the ease in determination and application of the law to be applied. Restatement (Second) of Conflict of Laws § 6(2) (1971); *Diamond State Insurance Co. v. Chester-Jensen Co., Inc.,* 243 Ill. App. 3d 471, 486 (1993).

¶ 57    We find that the relevant laws of Illinois and New York in this matter are both readily applicable. Furthermore, at the time of contracting, Continental was a New York-based company that issued the Neles policies from New York. The subject matter of the insurance and reinsurance, *i.e.*, Neles, also operated out of New York. Continental's global accounts group underwrote the Neles policies and the corresponding reinsurance agreements. The underwriter, Fleming, was based in London. However, Cecil Maxwell, a global accounts group casualty manager also

involved in the issuance of the policies and reinsurance, was based in New York. Maxwell directed another Continental employee in New York to issue a check for the reinsurance premium and mail it to London for disbursement to Pohjola in Helsinki. We conclude that New York has the most significant contacts in this matter. Accordingly, New York law applies and Pohjola has the burden of proving prejudice in the form of tangible economic injury.

¶ 58 Pohjola, however, argues that direct insurers claiming late notice do not need to prove prejudice under New York law, and Pohjola, as a 100% reinsurer should be treated as a direct insurer under New York law. Specifically, Pohjola argues that it, as a 100% reinsurer, should be treated as a direct insurer with a duty to defend because Continental had a duty to defend under the Neles policies. Pohjola offers no relevant support for this argument. Moreover, reinsurance is a contract of indemnity, not liability. *Unigard Security Insurance Co., Inc.*, 79 N.Y.2d at 582 (quoting *In the Matter of the Liquidation of Midland Insurance Co.*, 79 N.Y.2d 253, 258 (N.Y. 1992) ("a reinsurer's 'only obligation is to indemnify the primary insurer' ")); *People ex rel. Baylor v. Highway Insurance Co.*, 57 Ill. 2d 590, 595 (1974). Pohjola's obligation under the reinsurance contracts to reimburse Continental for 100% of the payments Continental made in connection with the Neles policies does not make Pohjola a direct insurer with a duty to defend Neles.

¶ 59 Pohjola also argues that, where late notice can qualify as a breach of the duty of utmost good faith under New York law, an insurer has a duty to disclose material facts to the reinsurer, the breach of which can render a reinsurance agreement voidable or rescindable. To support this proposition, Pohjola cites *Gerling Global Reinsurance Co.—U.S. Branch v. Ace Property & Casualty Insurance Co.*, 42 Fed. Appx. 522 (2d Cir. 2002), an unpublished decision. Then, Pohjola concludes that Continental should be held on summary judgment to have acted in bad faith because

it does not have complete copies of its reinsurance contracts approximately 35 years after issuance. Pohjola's reliance on *Gerling Global Reinsurance Co.* is misplaced. That case, which concerns reinsurance contract formation and fraud in the inducement (*id*.), is not relevant here to the issue of late notice of claims made after the reinsurance takes effect. Moreover, the fact that Continental lacks complete copies of the reinsurance contracts can be attributed to the passage of time, not bad faith, and New York law on late notice of claims in the reinsurance context does not include a bad faith exception. See *Unigard Security Insurance Co., Inc.*, 79 N.Y.2d at 584.

¶ 60    Regarding the prejudice element of Pohjola's late notice of claims defense, Pohjola argues that if it had received earlier notice, it would have associated itself with the direct claims-handling and somehow would have prevented Continental from paying defense costs on the asbestos claims. New York courts, however, have rejected this argument. See *id*.; *Unigard Security Insurance Co., Inc. v. North River Insurance Co.*, 4 F.3d 1049, 1068-69 (2d Cir. 1993) (declining, under New York law, to follow cases that found a lost right to associate constituted prejudice "without any actual proof that the results of the litigation would have been different"), *abrogated on other grounds by Global Reinsurance Corp. of America v. Century Indemnity Co.*, 22 F.4th 83, 95 (2d Cir. 2021). Moreover, Pohjola offers no evidence to show that if there had been earlier notice, Continental would not have paid as much under the Neles policies.

¶ 61    Instead, Pohjola criticizes the agreement Continental negotiated with NJI as poorly drafted and states that Neles did not use asbestos in its valves, even though New York law imposes an exceedingly broad duty to defend on liability insurers whenever there is a potential for coverage under a policy no matter how groundless, false or baseless the suit may be. See *American Western Home Insurance Co. v. Gjonaj Realty & Management Co.*, 192 A.D.3d 28, 34 (N.Y. App. Div.

2020). Pohjola essentially complains about Continental's defense obligations under the plain and standard language of Continental's liability policy, criticizes NJI's coverage under the Neles policy even though NJI was the successor entity after the merger of Neles and the Jamesbury Corporation, and complains that Continental could not withdraw from its negotiated agreement with NJI.

¶ 62    Pohjola fails to offer evidence on the prejudice element of its late notice of claim defense, and the existence of genuine issues of material fact concerning this issue preclude an award of summary judgment in favor of Pohjola.

¶ 63                                    III. CONCLUSION

¶ 64    For the foregoing reasons, we reverse the judgment of the circuit court that entered summary judgment in favor of Pohjola and against Continental. We remand the cause for further proceedings.

¶ 65    Reversed and remanded.